[No. D054120. Fourth Dist., Div. One. Aug. 24, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
STEPHON BUTLER, Defendant and Appellant.

**COUNSEL**

Carl Fabian, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Peter Quon, Jr., and Stephanie H. Chow, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**HALLER, J.**—Stephon Butler appeals from a judgment convicting him of involuntary manslaughter. He asserts there is insufficient evidence to support a finding that his conduct caused the victim's death, and the trial court erred in failing to instruct the jury on criminal negligence. We reject these contentions and affirm the judgment.

### OVERVIEW

The charges against defendant arose from an incident during which he and other individuals beat, tied up, suffocated and provided cocaine to the victim. Based on defendant's participation, he was charged with various offenses, including first degree felony murder, second degree murder, and false imprisonment by violence or menace. With respect to the homicide allegations, the jury was instructed on murder and on involuntary manslaughter as a lesser offense. The jury was also instructed that the predicate offenses underlying the involuntary manslaughter charge were furnishing cocaine, battery, and false imprisonment by violence or menace. The jury rejected the murder charges, was unable to reach a verdict on the false imprisonment allegation, and found defendant guilty of involuntary manslaughter.

Defendant's contentions on appeal concern solely the propriety of the involuntary manslaughter verdict. First, he raises numerous arguments challenging the sufficiency of the evidence to support the jury's causation finding. Because the evidence supports the conclusion that defendant committed acts that substantially and foreseeably contributed to the victim's death, these contentions fail.

Second, defendant asserts the jury should have been instructed on principles of criminal negligence. For reasons we shall explain, the instructions given by the trial court adequately informed the jury of the criminal

negligence standard applicable to the mens rea required for involuntary manslaughter, and there was no instructional error.

## FACTUAL AND PROCEDURAL BACKGROUND

On or about December 27, 2003, the victim (Steve Mathis) died in an apartment frequented by drug users. Shortly before Mathis's death, defendant was at the apartment, along with Alton Finley, James Washington, Dashawn Davis, Catherine Jacobs, and Tara Rhoades. Three of these individuals (Davis, Jacobs, and Rhoades) testified about the events that led to Mathis's death. According to these witnesses, while the group was at the apartment using cocaine, a dispute broke out between Mathis and several others, including defendant. The witnesses described Mathis being hit repeatedly, tied up, and silenced with a sock placed in his mouth. The jury found defendant participated in some of this conduct.

Davis testified that on the day of the homicide she arrived at the apartment and recognized Mathis as the person who had recently assaulted her at knifepoint. Mathis approached her to try "to be a peacemaker," but Davis hit him in the chest and pushed him away because she did not want "to hear it." Davis then provided cocaine for the people in the apartment to smoke. Shortly thereafter, defendant, Finley, and Washington started arguing with Mathis about money owed by Mathis. When Mathis started yelling in response, defendant punched Mathis in the mouth. The men calmed down and smoked more cocaine.

Mathis then tried to leave by running for the door, but Finley tackled Mathis to the floor. Defendant stripped Mathis of his clothes. Mathis tried to leave by going to the window, but defendant and Washington stopped him. Defendant and Washington took turns hitting Mathis "really hard" on his head, with defendant inflicting about four blows. Mathis was loudly screaming, " 'Stop, stop, stop.' "

Davis testified that Mathis started acting "all wild," and in response defendant said, " 'Tie him up.' " Defendant held Mathis facedown on the floor and placed his knee on Mathis's back. Davis helped tie Mathis's feet and someone else tied his hands.[1] Mathis continued yelling, and to make him stop defendant turned Mathis's head and placed a sock in his mouth. Mathis lay tied up and facedown on the floor with the sock in his mouth for about 10 or 15 minutes.

---

[1] On cross-examination, Davis acknowledged that when interviewed by a detective, she stated that Washington was the person who instructed that Mathis be tied up and who held Mathis down when he was being tied up.

Rhoades and Jacobs witnessed portions of the altercation.[2] Rhoades testified that Davis punched Mathis in the face, and defendant grabbed and pushed Mathis to stop him from leaving out the door. Finley tripped Mathis before Mathis could reach the door, causing Mathis to fall to the floor. Mathis tried to leave through the window, but was blocked from doing so by defendant and others. They took off Mathis's clothes so he could not leave. Mathis was saying, " 'help.' " Defendant continued to grab and push Mathis. The fighting would stop and then start again, and at some point defendant gave Mathis more cocaine. Defendant held Mathis's hands over his head, and someone (possibly Davis) tied his feet.

Jacobs testified that defendant and Davis pushed Mathis and took Mathis's jacket and other items. Mathis "freaked out" and ran over to the television and pulled it off the stand by its cord. Defendant and Davis grabbed Mathis, and defendant restrained Mathis. Davis hit Mathis in the face. "[E]veryone" was then "roughing" up Mathis.[3]

At some point after Mathis was tied up defendant apparently noticed that Mathis had stopped breathing. Defendant tried to revive Mathis by hitting his chest, but Mathis did not move. Panicked, everyone left the apartment.

On December 29, 2003, a security officer at the apartment complex received a tip about a possible dead body at the apartment, and the police were summoned. At the apartment, the authorities observed that Mathis's wrists and ankles were bound. Medical examiner Dr. Steven Campman testified that Mathis had suffered multiple blunt force injuries, including scrapes and bruises around his face, neck, collarbone, shoulders, chest, hip, arms, legs, and back. He had petechial hemorrhages on the conjunctiva of one eye and the skin around both eyes and he had injuries to the inside of his lips, which could suggest asphyxiation by his mouth being held closed. Underneath Mathis's body, the authorities found a washcloth and shirt with "blood dilute" on them. Based on the observation of bleeding inside Mathis's mouth, Dr. Campman testified these items could have been placed around Mathis's mouth to contribute to the asphyxiation.[4] Mathis also had bleeding around the brain associated with blunt force injury to the head. He tested positive for cocaine.

---

[2] Rhoades went to the bathroom on and off during the incident, and also left the apartment for a short period. Jacobs was asleep at the beginning of the incident, and fled to the bathroom after it started.

[3] Jacobs testified she was not sure if defendant was still holding Mathis when Davis hit Mathis, and she did not see defendant hit Mathis.

[4] The prosecution's theory was that the washcloth (rather than what witness Davis thought was a sock) was placed in Mathis's mouth; that the blood dilute on the cloth was a mixture of

Dr. Campman testified that Mathis died from a combination of blunt force head injuries, restraint, asphyxiation, and acute cocaine toxicity. Dr. Campman explained that restraint, especially with the arms behind the back, can inhibit respiration, and restraint can contribute to death when it occurs in the context of an assault that causes an abnormal heartbeat. Asphyxiation occurs when a person is not able to get enough oxygen; the petechial hemorrhages, lip injuries, restraint, and blunt force injuries all supported asphyxiation. The cocaine also likely contributed to an irregular heartbeat that ultimately caused the death.

When asked if any of the four factors alone might have caused the death, Dr. Campman testified that it was not appropriate to separate them out and that it was "best to say that a combination caused his death" because they were all present. Dr. Campman explained that bleeding around the brain can cause death if enough blood accumulates, but Mathis died before the blood had expanded to a point sufficient to cause death from an accumulation of blood alone. Further, it would be unlikely for a person to die just from being bound up. Dr. Campman stated that asphyxiation by itself can cause death, and that cocaine alone can cause death from an abnormal heart rate. However, Dr. Campman opined the other conditions (binding and head injuries) also contributed to Mathis's death.

*Defense*

Defendant testified on his own behalf to describe his version of what occurred at the apartment. Defendant stated that when he was at the apartment he shared some of his cocaine with other people there, including Mathis. Mathis and Davis then started bickering with each other. Defendant asked Finley to make them leave the apartment because their bickering was getting on his nerves. After Finley declined to do so, defendant gave more cocaine to Mathis and Davis in the hopes this would quiet them. Defendant dozed off but then was awoken by a commotion. Davis, Finley, Washington, and Mathis were fighting. They were pushing, shoving and swinging at each other. Defendant tried to break up the fight by going in the middle of the group and pushing everyone back to separate them. Mathis continued to be aggressive while the others backed off; defendant pushed Mathis to make him sit down. Everyone calmed down and went back to smoking cocaine.

Defendant then left the room to go to the bathroom. While in the bathroom, he heard the fight start back up; he heard loud arguing and banging. When he exited the bathroom, Washington was pinning Mathis on

blood and saliva from Mathis's mouth; and that defendant turned Mathis around to try to revive him thereby causing the cloth to end up under the body. A sock was also found near Mathis's body.

the bed, Davis was tying up Mathis's feet, and Finley was apparently tying up Mathis's hands. As defendant tried to break them apart by pushing them away, Mathis rolled onto the floor. When defendant noticed that Mathis was not saying anything, defendant nudged him and asked if he was all right. When Mathis did not respond, defendant tried to revive him by pressing on his chest. Defendant denied that he hit Mathis or took clothes or other property from him.

*Jury Verdict and Sentencing*

Defendant was charged with murder, kidnapping for ransom or extortion, torture, and false imprisonment by violence or menace. The jury acquitted him of murder, kidnapping for ransom or extortion, torture, and assault by means of force likely to produce great bodily injury (as a lesser offense of torture). The jury found him guilty of involuntary manslaughter, and was unable to reach a verdict on false imprisonment by violence or menace (as a lesser offense of the kidnapping charge). The court sentenced defendant to six years in prison, consisting of four years for involuntary manslaughter and two years for two prior prison term enhancements.

## DISCUSSION

Defendant argues his involuntary manslaughter conviction must be reversed because (1) there is insufficient evidence to support causation, and (2) the jury was not instructed on principles of criminal negligence. To resolve these claims, we first review the legal principles relevant to the mens rea element of involuntary manslaughter, and the principles governing the causation element.

### A. *Legal Principles Governing Involuntary Manslaughter*

Involuntary manslaughter is a lesser offense of murder, distinguished by its mens rea. (*People v. Rios* (2000) 23 Cal.4th 450, 460 [97 Cal.Rptr.2d 512, 2 P.3d 1066].) The mens rea for murder is specific intent to kill or conscious disregard for life. (*Ibid.*) Absent these states of mind, the defendant may incur homicide culpability for involuntary manslaughter. (*Id.* at p. 466; *People v. Garcia* (2008) 162 Cal.App.4th 18, 26–30 [74 Cal.Rptr.3d 912].) Through statutory definition and judicial development, there are three types of acts that can underlie commission of involuntary manslaughter: a misdemeanor, a lawful act, or a noninherently dangerous felony. (See *Garcia, supra,* at pp. 27–29.) As we shall explain, for all three types of predicate acts the required mens rea is criminal negligence.

■ Involuntary manslaughter based on the predicate act of a misdemeanor or a lawful act is statutorily defined in Penal Code section 192,

subdivision (b), which states the offense is a (1) a killing "in the commission of an unlawful act, not amounting to felony," or (2) a killing "in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." In addition to these statutorily defined means of committing involuntary manslaughter, the California Supreme Court has defined a nonstatutory form of the offense, based on the predicate act of a noninherently dangerous felony committed without due caution and circumspection. (*People v. Burroughs* (1984) 35 Cal.3d 824, 835–836 [201 Cal.Rptr. 319, 678 P.2d 894], disapproved on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 89 [96 Cal.Rptr.2d 451, 999 P.2d 675].)

■ Over the years, the California Supreme Court has clarified the mens rea applicable to each of these three types of predicate acts that can underlie involuntary manslaughter. In *People v. Penny* (1955) 44 Cal.2d 861, 869 [285 P.2d 926], the court addressed the statutory form of involuntary manslaughter based on the commission of a lawful act without due caution and circumspection, and defined the mens rea to mean criminal negligence. Later, in *People v. Burroughs, supra,* 35 Cal.3d 824, when analyzing the nonstatutory means of committing involuntary manslaughter based on the commission of a noninherently dangerous felony, the court again defined the mens rea as criminal negligence. (*Id.* at pp. 835–836; *People v. Garcia, supra,* 162 Cal.App.4th at p. 30.) In more recent cases, the court evaluated the statutory form of committing involuntary manslaughter based on the commission of a nonfelonious unlawful act (i.e., a misdemeanor), and clarified that the misdemeanor did not need to be inherently dangerous, but it did need to comport with the criminal negligence standard generally applicable to involuntary manslaughter. (*People v. Wells* (1996) 12 Cal.4th 979, 984–989 [50 Cal.Rptr.2d 699, 911 P.2d 1374]; *People v. Cox* (2000) 23 Cal.4th 665, 670–676 [97 Cal.Rptr.2d 647, 2 P.3d 1189].) In *Wells* and *Cox,* the court stated that the relevant inquiry was not whether the misdemeanor was dangerous in the abstract, but rather whether it was dangerous under the circumstances of its commission. (*Wells, supra,* at p. 988; *Cox, supra,* at p. 676.)

■ Under this authority, criminal negligence is the governing mens rea standard for all three forms of committing the offense. (See *People v. Wells, supra,* 12 Cal.4th at p. 988 [misdemeanor causing death must be committed " 'through criminal negligence' "]; *People v. Penny, supra,* 44 Cal.2d at p. 869 [lawful act without due caution and circumspection means with criminal negligence]; *People v. Burroughs, supra,* 35 Cal.3d at p. 836 [noninherently dangerous felony committed without due caution and circumspection is involuntary manslaughter].)

Criminal negligence has been defined in a variety of ways. In *People v. Penny, supra,* 44 Cal.2d at page 879, the court explained: " '[C]riminal negligence' " exists when the defendant engages in conduct that is " 'aggravated, culpable, gross, or reckless' "; i.e., conduct that is " 'such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences.' " Similarly, in *People v. Rodriguez* (1960) 186 Cal.App.2d 433, 440 [8 Cal.Rptr. 863], the court stated that criminal negligence exists "when a man of ordinary prudence would foresee that the act would cause a high degree of risk of death or great bodily harm."

■ The performance of an act with criminal negligence supplies the criminal intent for involuntary manslaughter, regardless whether the conduct underlying the offense is a misdemeanor, a lawful act, or a noninherently dangerous felony. That is, when a defendant commits a misdemeanor in a manner dangerous to life, the defendant's conduct "qualifies as gross negligence," and culpability for involuntary manslaughter is warranted because the defendant has performed an act " 'under such circumstances as to supply the intent to do wrong and inflict some bodily injury.' " (*People v. Wells, supra,* 12 Cal.4th at pp. 987–989, italics omitted; see *People v. Cox, supra,* 23 Cal.4th at pp. 673–675.) Similarly, when a defendant commits a lawful act or a noninherently dangerous felony with criminal negligence, the defendant is presumed to have had an awareness of, and conscious indifference to, the risk to life, regardless of the defendant's actual belief. (*People v. Watson* (1981) 30 Cal.3d 290, 296 [179 Cal.Rptr. 43, 637 P.2d 279]; *Walker v. Superior Court* (1988) 47 Cal.3d 112, 136–137 [253 Cal.Rptr. 1, 763 P.2d 852]; see *People v. Rippberger* (1991) 231 Cal.App.3d 1667, 1682 [283 Cal.Rptr. 111].)

■ Both murder (based on implied malice) and involuntary manslaughter involve a disregard for life; however, for murder the disregard is judged by a subjective standard whereas for involuntary manslaughter the disregard is judged by an objective standard. (*Walker v. Superior Court, supra,* 47 Cal.3d at pp. 136–137; *People v. Watson, supra,* 30 Cal.3d at pp. 296–297.) Implied malice murder requires a defendant's conscious disregard for life, meaning that the defendant subjectively appreciated the risk involved. (*People v. Watson, supra,* 30 Cal.3d at pp. 296–297.) In contrast, involuntary manslaughter merely requires a showing that a reasonable person would have been aware of the risk. (*Ibid.*)[5] Thus, even if the defendant had a subjective,

---

[5] Implied malice also "contemplates a subjective awareness of a higher degree of risk than does gross negligence, and involves an element of wantonness which is absent in gross negligence." (*People v. Watson, supra,* 30 Cal.3d at p. 296; see also *People v. Knoller* (2007) 41 Cal.4th 139, 156 [59 Cal.Rptr.3d 157, 158 P.3d 731].)

good faith belief that his or her actions posed no risk, involuntary manslaughter culpability based on criminal negligence is warranted if the defendant's belief was objectively unreasonable. (*Walker v. Superior Court, supra,* 47 Cal.3d at pp. 136–137; see *People v. Rippberger, supra,* 231 Cal.App.3d at p. 1682; *People v. Evers* (1992) 10 Cal.App.4th 588, 596 [12 Cal.Rptr.2d 637].)

Involuntary manslaughter, like other forms of homicide, also requires a showing that the defendant's conduct proximately caused the victim's death. (*People v. Sanchez* (2001) 26 Cal.4th 834, 845 [111 Cal.Rptr.2d 129, 29 P.3d 209]; *People v. Brady* (2005) 129 Cal.App.4th 1314, 1324 [29 Cal.Rptr.3d 286].) When there are concurrent causes of death, the defendant is criminally responsible if his or her conduct was a substantial factor contributing to the result. (*People v. Catlin* (2001) 26 Cal.4th 81, 155 [109 Cal.Rptr.2d 31, 26 P.3d 357].) As explained in *People v. Sanchez:* " ' "There may be more than one proximate cause of the death. When the conduct of two or more persons *contributes concurrently as the proximate cause of the death,* the conduct of each is a proximate cause of the death if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was operative at the time of the death and acted with another cause to produce the death." ' " (*Sanchez, supra,* 26 Cal.4th at p. 847.)

When there are multiple concurrent causes of death, the jury need not decide whether the defendant's conduct was the primary cause of death, but need only decide whether the defendant's conduct was a substantial factor in causing the death. (*People v. Jennings* (2010) 50 Cal.4th 616, 634, 642–644 [114 Cal.Rptr.3d 133, 237 P.3d 474] [defendant liable for murder by torture even though drugs given to victim were identified as sufficient to cause death; substantial factor standard subsumes and reaches beyond "but for" test]; *People v. Catlin, supra,* 26 Cal.4th at pp. 154–156 [defendant liable for poisoning victim even though victim's preexisting illness may have contributed to death]; *People v. Caldwell* (1984) 36 Cal.3d 210, 221 [203 Cal.Rptr. 433, 681 P.2d 274] [when codefendants act in concert, "the extent of [the defendant's] contribution to the resulting death need not be minutely determined"]; *People v. Vernon* (1979) 89 Cal.App.3d 853, 864 [152 Cal.Rptr. 765] [defendant liable for death resulting from his participation in group beating; conduct of each person was proximate cause "regardless of the extent to which each contribute[d] to the death"]; see also *People v. Sanchez, supra,* 26 Cal.4th at pp. 838, 848–849 [defendant liable for death of innocent bystander during shootout with rival gang member even though it was not known who actually fired fatal shot; jury could find defendant's shooting at rival was a "substantial concurrent, and hence proximate" cause of bystander's death].)

Further, proximate causation requires that the death was a reasonably foreseeable, natural and probable consequence of the defendant's act, rather

than a remote consequence that is so insignificant or theoretical that it cannot properly be regarded as a substantial factor in bringing about the death. (*People v. Catlin, supra,* 26 Cal.4th at p. 155; *People v. Penny, supra,* 44 Cal.2d at p. 880; *People v. Briscoe* (2001) 92 Cal.App.4th 568, 583–584 [112 Cal.Rptr.2d 401].) Whether the defendant's conduct was a proximate, rather than remote, cause of death is ordinarily a factual question for the jury unless " 'undisputed evidence . . . reveal[s] a cause so remote that . . . no rational trier of fact could find the needed nexus.' " (*People v. Brady, supra,* 129 Cal.App.4th at p. 1326.) A jury's finding of proximate causation will be not disturbed on appeal if there is "evidence from which it may be reasonably inferred that [the defendant's] act was a substantial factor in producing" the death. (*People v. Scola* (1976) 56 Cal.App.3d 723, 726 [128 Cal.Rptr. 477].)

### B. *Sufficiency of the Evidence of Causation*

To support his challenge to the jury's causation finding, defendant relies on the prosecution's medical expert's testimony that four factors contributed to the victim's death. He asserts that because the expert could not identify any of the four causes as "more prominent" than another, the jury could not "ascrib[e] a single cause as a substantial factor" in the death. The contention is unavailing. As set forth above, when there are multiple concurrent causes of death, the jury is not required to determine which, if any, cause was the primary cause. Rather, the jury need only determine that the defendant's conduct was a substantial factor contributing to the death. (*People v. Jennings, supra,* 50 Cal.4th at p. 644 [jury could reasonably find defendant's torture was substantial factor in causing death even though expert testified that death was attributable to several factors " '*all working together*' " to bring about the death]; *People v. Catlin, supra,* 26 Cal.4th at p. 155; *People v. Sanchez, supra,* 26 Cal.4th at pp. 848–849.) The record supports this finding.

The four cause-of-death factors identified by the prosecution's medical expert were head injuries, restraint, asphyxiation, and cocaine toxicity. The alleged predicate offenses for the involuntary manslaughter charge were furnishing cocaine, simple battery, and false imprisonment by violence or menace. Because the jury did not reach a verdict on the false imprisonment charge alleged as a distinct count, we will presume its involuntary manslaughter verdict was based on the predicate crimes of simple battery and/or furnishing cocaine.[6] Considering these latter two offenses in relation to the expert's cause-of-death factors, and drawing all inferences in favor of the judgment (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 [75 Cal.Rptr.3d 289,

---

[6] False imprisonment was alleged as a distinct count, as well as a predicate offense underlying the involuntary manslaughter lesser offense charge. The jury deadlocked on the false imprisonment count. The verdict does not indicate what predicate offenses the jury relied upon to reach the involuntary manslaughter guilty verdict.

181 P.3d 105]), we assume the jury found that defendant committed the acts of inflicting head injury (battery), asphyxiation by placing a sock or cloth in the victim's mouth (battery), and contributing to cocaine toxicity (furnishing cocaine).

■ The record supports that defendant engaged in the conduct that substantially contributed to the death. Witness testimony indicated that he repeatedly hit the victim, placed a sock (or other cloth) in the victim's mouth, and gave the victim cocaine. The jury could reasonably infer that the blows caused head trauma, the cloth insertion caused asphyxiation, and the cocaine caused toxicity. These were all factors identified by the prosecution's medical expert as contributing to the victim's death, thus providing substantial evidence to support that defendant's conduct was a substantial factor in causing the death.

Defendant raises several additional challenges to the causation finding, all of which are unavailing when considered in light of the substantial factor test that governs the determination of causation. Defendant points out that he was not found culpable of false imprisonment; that the instructions allowed the jury to find involuntary manslaughter even if he committed only one predicate offense; and that the evidence does not show his act of providing cocaine or committing battery was lethal. None of these considerations defeat the jury's verdict. Even if defendant did not commit the false imprisonment, the jury could reasonably find he substantially contributed to the death by committing battery and furnishing cocaine. Further, even though the instructions indicated that the jury could find defendant guilty of involuntary manslaughter based on only one of the predicate offenses,[7] the jury was also instructed that defendant's acts must be a substantial factor in causing the death. (See CALCRIM No. 580.) Thus, the jury would not have reached an involuntary manslaughter guilty verdict unless it found the act or acts it found defendant committed substantially contributed to the death. Additionally, it was not necessary for defendant's acts to be lethal standing alone, as long as they substantially contributed to the death.

Finally, defendant argues that the evidence does not support a finding that committing simple battery or furnishing cocaine could foreseeably lead to death. Foreseeability does not require a high probability that the harm will occur, but merely that the harm be " ' "a possible consequence which might reasonably have been contemplated." ' " (*People v. Medina* (2009) 46 Cal.4th 913, 920 [95 Cal.Rptr.3d 202, 209 P.3d 105].) Evidence was presented indicating that defendant participated in the events leading to the victim's

---

[7] The instructions on involuntary manslaughter included a statement that the jury could not find the defendant guilty of involuntary manslaughter unless all jurors agreed the defendant committed at least one of the alleged acts and all agreed he committed the same act or acts.

death by hitting him, placing a sock or other cloth in his mouth, and providing him cocaine. The evidence also supports that the victim was being hit by other persons as well as defendant, and that the victim was tied up so that he could not remove the sock or cloth from his mouth. Although the jury did not find defendant guilty of false imprisonment, this did not defeat the showing that the victim's hands and feet were in fact bound and that defendant was aware of this restraint when he placed the sock or cloth in his mouth. The jury could reasonably conclude that it was foreseeable that a person who has been using cocaine, has been repeatedly hit, whose hands and feet are bound, and whose mouth is obstructed with a cloth item, might not survive the ordeal.

Defendant's challenge to the sufficiency of the evidence of causation fails.

### C. *Failure to Instruct on Criminal Negligence*

Defendant asserts the trial court's instructions on involuntary manslaughter were deficient because they did not include instruction on principles of criminal negligence. As we shall explain, the trial court adequately advised the jury of the criminal negligence mens rea applicable to involuntary manslaughter by instructing the jury that the predicate crimes underlying the involuntary manslaughter allegation must have been committed in a manner that posed a high risk of death or great bodily injury.

As set forth above, there are three types of predicate acts that may underlie involuntary manslaughter: a misdemeanor, a lawful act, or a noninherently dangerous felony. All three acts require the same mens rea of criminal negligence. (See *People v. Wells, supra,* 12 Cal.4th at pp. 988–989; *People v. Cox, supra,* 23 Cal.4th at p. 673; *People v. Penny, supra,* 44 Cal.2d at p. 869; *People v. Burroughs, supra,* 35 Cal.3d at pp. 835–836.) Here, the predicate acts underlying the involuntary manslaughter allegation consisted of a misdemeanor (simple battery, Pen. Code, §§ 242, 243, subd. (a)) and two felonies (furnishing cocaine, Health & Saf. Code, § 11352; and false imprisonment by violence or menace, Pen. Code, §§ 236, 237, subd. (a)). No lawful acts were alleged as predicate acts underlying the involuntary manslaughter charge.

The trial court instructed the jury with the standard CALCRIM instruction for involuntary manslaughter (CALCRIM No. 580). This instruction couples the misdemeanor and noninherently dangerous felony categories together, stating that involuntary manslaughter is committed when the defendant "committed a *crime* that posed a high risk of death or great bodily injury because of the way in which it was committed." (Italics added.) Separately addressing the lawful act avenue of committing involuntary manslaughter, the instruction states that involuntary manslaughter is committed when the

defendant committed "a lawful act, but acted with criminal negligence," and then provides further instructions defining criminal negligence with respect to the lawful act. CALCRIM No. 580 does *not* contain a separate statement that a misdemeanor or felony must be committed with criminal negligence.

Here, because the alleged conduct underlying the involuntary manslaughter charge did not include a lawful act, the court (with defense counsel's apparent acquiescence) did not give the portion of CALCRIM No. 580 addressing a lawful act.[8] Rather, the trial court instructed the jury with the portion of the instruction addressing misdemeanors and noninherently dangerous felonies, i.e., stating that the defendant committed involuntary manslaughter if the defendant committed a crime that posed a high risk of death or great bodily injury because of the way in which it was committed. On appeal, defendant asserts the trial court had a sua sponte duty to include further instruction on criminal negligence.[9]

■ The trial court has a sua sponte duty to instruct the jury on the general principles of law that are necessary for the jury's understanding of the case. (*People v. Mayfield* (1997) 14 Cal.4th 668, 773 [60 Cal.Rptr.2d 1, 928 P.2d 485].) Once the trial court adequately instructs the jury on the law, it has no duty to give clarifying or amplifying instructions absent a request. (*Id.* at p. 778.) In reviewing a claim that the court's instructions were incorrect or misleading, we inquire whether there is a reasonable likelihood the jury understood the instructions as asserted by the defendant. (*People v. Cross* (2008) 45 Cal.4th 58, 67–68 [82 Cal.Rptr.3d 373, 190 P.3d 706].) We consider the instructions as a whole and assume the jurors are intelligent persons capable of understanding and correlating all the instructions. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 [78 Cal.Rptr.3d 186].)

---

[8] Defense counsel initially requested instruction on criminal negligence with respect to involuntary manslaughter, but then withdrew the request when he recognized there was no lawful act alleged among the predicate acts underlying the involuntary manslaughter allegation.

[9] Based on the language of CALCRIM No. 580, the jury was instructed relevant to mens rea as follows: "The defendant committed involuntary manslaughter if . . . [¶] . . . the defendant committed a crime that posed a high risk of death or great bodily injury because of the way in which it was committed."

Because no lawful act was involved, the trial court omitted the following language contained in CALCRIM No. 580: "The defendant committed involuntary manslaughter if . . . [¶] [t]he defendant . . . committed a lawful act, but acted with criminal negligence . . . . [¶] . . . [¶] Criminal negligence involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with criminal negligence when: [¶] 1. He or she acts in a reckless way that creates a high risk of death or great bodily injury; [¶] AND [¶] 2. A reasonable person would have known that acting in that way would create such a risk. [¶] In other words, a person acts with criminal negligence when the way he or she acts is so different from the way an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act."

 The trial court's adherence to the formulation of the instruction in CALCRIM No. 580 adequately informed the jury of the criminal negligence standard applicable to all three forms of involuntary manslaughter. As stated in *People v. Rodriguez, supra,* 186 Cal.App.2d at page 440, "an act is criminally negligent when a man of ordinary prudence would foresee that the act would cause a high degree of risk or great bodily harm." This is essentially the same standard provided to the jury by the trial court; i.e., defendant committed involuntary manslaughter if the "defendant committed a crime that posed a high risk of death or great bodily injury because of the way in which it was committed."

We note the jury instruction did not reference the objective standard applicable to involuntary manslaughter; i.e., whether a reasonable person would have known that the act created a high risk of death or great bodily injury. However, there is nothing to suggest that the failure to provide the jury with this information harmed defendant. The jury was merely told that the crime must be committed in a manner that posed a high risk of death or great bodily harm; the jury was not told that defendant need *not* be subjectively aware of the high risk as long as a reasonable person would be aware. Absent direction on the standard to apply, the jurors would likely have looked at the circumstances to determine whether in their view there was a high risk. Because the jurors' unanimous conclusion on this point reflects the viewpoint of 12 persons drawn from the community at large, this approach could equate with the objective (reasonable person) standard. In any event, even if the jury improperly applied a subjective standard when evaluating mens rea (i.e., whether the circumstances showed defendant was aware of the risk), this would have inured to defendant's benefit as the jury would have had to agree unanimously on a fact not required for an involuntary manslaughter conviction.

Further, the jury was apprised of the applicable reasonable person standard when instructed on causation; i.e., the jurors were told that the death must be a natural and probable consequence of the act and that this means a consequence that "a reasonable person would know is likely to happen if nothing unusual intervenes." (CALCRIM No. 580.) Thus, the jury would not have found involuntary manslaughter culpability if it thought the risk of death was only apparent in hindsight, because in this circumstance a reasonable person could not have foreseen the consequence.

Although instruction on criminal negligence in the language of CALCRIM No. 580 would have further expanded on the concept of a gross lack of due caution, the additional information on this subject was not necessary for the jury's understanding of the case. The criminal negligence portion of CALCRIM No. 580 sets forth the requirements that the defendant acted with

more than "ordinary carelessness, inattention, or mistake in judgment," and that the defendant's conduct was "so different from the way an ordinarily careful person would act" that the conduct "amounts to disregard for human life or indifference to the consequences of that act." (See fn. 9, *ante.*) These concepts were sufficiently conveyed to the jury through the instruction stating that the crime must be committed in a manner that poses a high risk of death or great bodily injury. Reasonable jurors would have understood that commission of a crime in a manner that posed a high risk of death or great bodily injury constitutes conduct that is more than mere carelessness or inattention and reflects a disregard or indifference to life and human safety.

The jury was also instructed that the predicate offenses had to be committed willfully or knowingly, thus ensuring the jury understood that accidental conduct could not support an involuntary manslaughter verdict.[10] Reasonable jurors would have recognized that purposeful or knowing conduct committed in a manner posing a high risk of death or great bodily harm is more than mere carelessness or mistaken judgment.

Defendant contends the trial court's instruction omitted the concept that the defendant must have acted with disregard for life. For murder the defendant must have acted with intent to kill or conscious disregard for life; in contrast, for involuntary manslaughter the defendant must have acted *without* intent to kill or conscious disregard for life. (*People v. Rios, supra,* 23 Cal.4th at p. 466.) Thus, the reference to "disregard for life" in the context of criminal negligence is to the life-threatening *act* committed in a manner that objectively reflects this mental state, even though the defendant did not subjectively entertain this state of mind. (*People v. Watson, supra,* 30 Cal.3d at pp. 296–297; *Walker v. Superior Court, supra,* 47 Cal.3d at pp. 136–137; see *People v. Rippberger, supra,* 231 Cal.App.3d at p. 1682.) As stated, the instruction to the jury that the crime must have been committed under circumstances posing a high risk of death or great bodily injury conveyed the concept of an act showing a disregard for life.

Finally, to support his claim of instructional error, defendant points out that in closing argument the prosecutor argued that involuntary manslaughter does not require commission of "an act with disregard for human life." To the extent the prosecutor was suggesting that involuntary manslaughter does not require a subjective disregard for life, the argument would not have misled the jurors on the correct standard to apply. Further, because the jury knew

---

[10] The jury was instructed that to commit the predicate offense of simple battery, the defendant must willfully (i.e., willingly or on purpose) touch the victim in a harmful or offensive manner, and to commit the predicate offense of furnishing cocaine, the defendant must know of the drug's presence and character as a controlled substance. (See CALCRIM Nos. 960, 2300.)

from the instructions that the predicate act needed to create a high risk of death or great bodily injury, there is no reasonable likelihood the argument caused the jury to believe it could convict on involuntary manslaughter if the circumstances of the act did not objectively reflect a disregard for life.[11]

## DISPOSITION

The judgment is affirmed.

McConnell, P. J., and McDonald, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 1, 2010, S186917.

---

[11] We note that because the mens rea for involuntary manslaughter is criminal negligence regardless of the nature of the predicate act underlying the offense, expanded instructions on criminal negligence for all three types of predicate acts would be preferable. However, the instructions given here were not erroneous.