Filed 1/4/21

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER EDWARD SKIFF,<br><br>  Defendant and Appellant. | 2d Crim. No. B296037<br>(Super. Ct. No. 17F-06360-A)<br>(San Luis Obispo County) |

  A Residential Care Facility for the Elderly (RCFE) admitted to the facility a resident diagnosed with dementia in violation of the conditions of the facility's license. Despite growing evidence of his confusion, the resident was allowed to wander through the community unsupervised. When the resident ran in front of a car on a busy highway, the CEO of the RCFE was found criminally responsible for his death.

  Christopher Edward Skiff appeals from the judgment after the jury convicted him of elder abuse (Pen. Code, § 368, subd. (b)(1)) and involuntary manslaughter (Pen. Code, § 192, subd. (b)) and found true allegations that the victim suffered great bodily injury (Pen. Code, § 368, subd. (b)(2)(A)) and that

elder abuse proximately caused the victim's death (Pen. Code, § 368, subd. (b)(3)(A)).  The trial court placed him on probation for five years with various terms and conditions, including 180 days in the county jail.

Skiff contends there is no substantial evidence he committed either offense because:  (1) he did not proximately cause the victim's death, (2) he lacked the intent required for involuntary manslaughter and elder abuse, and (3) statutes and regulations applicable to RCFEs prohibited him from imposing restrictions sufficient to prevent the fatal accident.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Regulatory history*

The Manse on Marsh (The Manse) was an RCFE. Skiff was the CEO of Horizon Senior Living, Inc., which owned the facility.  He was the licensee representative with ultimate regulatory responsibility over facility operations.

When an RCFE admits a resident with dementia, it must file a dementia care plan with state regulators addressing, among other things, physical plant requirements (including door alarms) and staff training.  The Manse was not authorized to house residents with dementia because it did not have an operable dementia care plan.[1]

In 2007, the state cited The Manse for admitting nine residents with dementia without having a dementia care plan on file.  A state licensing representative met with Skiff, who agreed to reevaluate those residents, and evict them if they were diagnosed with dementia.  He stated that a dementia care plan would not be submitted because the facility would not retain

_____

[1] The Manse had filed a plan but withdrew it by advising the state it would not accept dementia patients.

2

residents with dementia.

The state cited The Manse again in 2008 for retaining residents with dementia without having a dementia care plan. In 2009, The Manse was cited for failing to reevaluate a resident's change of condition from mild cognitive impairment (MCI) to possible dementia after she wandered away from the facility.

A manager from the Community Care Licensing Division testified at trial that when a resident is admitted with a doctor's authorization to leave the facility unassisted, the licensee must continue to observe the resident's condition and reevaluate the patient if their condition changes.

*Cardenas's admission to The Manse*

In 2012, Mauricio Cardenas was 63 years old. A neurologist, Dr. Paul Gertler, diagnosed him that year with dementia, most likely Alzheimer's disease. Dr. Gertler testified that dementia is not a specific diagnosis but an impairment of intellectual function with many causes, the most common of which is Alzheimer's disease. Alzheimer's gets worse over time and is irreversible.

A geriatric care consultant specializing in dementia assisted Cardenas commencing in May 2013. Cardenas had trouble using the phone, was unable to take medication on his own, and was not making good decisions. His short-term memory was "terrible." By the end of a conversation, he could not remember what was said.

Dr. James Sands evaluated Cardenas in January 2014. He completed a Physician's Report for Residential Care Facilities for the Elderly (Form 602) with a primary diagnosis of Alzheimer's disease. He checked the box for "Dementia: The loss

3

of intellectual function (such as thinking, remembering, reasoning, exercising judgement, and making decisions) and other cognitive functions, sufficient to interfere with an individual's ability to perform activities of daily living or to carry out social or occupational activities." He checked "Yes" for "Confused/Disoriented" and "No" for "Wandering Behavior." He checked a box for "Able to Leave Facility Unassisted." The form was submitted to The Manse.

Based on this diagnosis, The Manse rejected Cardenas for admission in January 2014. Skiff knew Cardenas was rejected based on the dementia diagnosis.

After living in another retirement community, Las Brisas, for about two months, Cardenas again requested admission to The Manse. The directors and managers of The Manse, including Skiff, discussed admitting Cardenas as a high priority potential resident in their daily meetings. These meetings were called "stand-up" meetings because participants were required to stand throughout the meeting.

At a stand-up meeting with Skiff present, the director of sales and marketing for The Manse shared concerns from her counterpart at Las Brisas about Cardenas moving to The Manse because Cardenas would leave Las Brisas, could not be found or would return drunk, and there was a bar across a busy street from The Manse. Skiff did not respond to these concerns, ask her any questions, or ask her to get more information. "It was as if [she] hadn't said anything."

At one meeting, three staff members said Cardenas should not be admitted because of his dementia. Skiff took off his glasses, looked straight at them, and said to admit Cardenas. Skiff told a nurse to get the doctor to change the diagnosis, and

was emphatic that they "get the forms done" so he could move in. Skiff's executive assistant was "stunned" with his expression and emphatic tone.

A nurse at The Manse asked Dr. Ward to complete a 602 "to get [the Alzheimer's diagnosis] changed." The evidence does not establish that he submitted a form that changed the diagnosis.

In March 2014, Cardenas was examined by Dr. Eric Dunlop. He completed a Form 602 listing a diagnosis of dementia. He checked the box for "Confused/Disoriented." He checked "No" for "Wandering Behavior" and wrote, "Runs two miles daily, but can find his way home and able to leave facility unassisted." Cardenas's application at The Manse was then accepted. He was admitted in April 2014.

*Problems at The Manse*

K.J. worked at The Manse as a registered nurse with 43 years' experience. She testified that Cardenas could not remember to sign in and out. He left the building to go jogging three to five times a day and would return "eventually." He was agitated, missed meals or arrived late, lost his keys, and tried to leave the building with inappropriate clothing for the climate. Incidents occurred daily and kept escalating.

At stand-up meetings, K.J. often raised concerns about Cardenas, more so than any other resident. She reported that he got lost at an outing downtown. Skiff was "not particularly" concerned about the issues she raised and did not direct her to take any steps in response.

K.J. testified that staffing was not adequate to supervise Cardenas, or to look for him when he could not be found. She made multiple requests for more staff, but was told

5

The Manse was staffed adequately for the number of residents. She was told, "Fill up the rooms, and we'll talk about more staff." The goal was "to keep all the rooms rented at all costs." Skiff was present and participated in most of these discussions.

At one point, Cardenas went to the emergency room with abdominal pain. The doctor called The Manse and asked how bad his dementia was, because Cardenas was unable to provide any information. K.J. brought this up at a stand-up meeting. In response, Skiff sent her an email telling her that if she believed a resident had a condition that might prohibit them from residing at The Manse, she should speak to the executive director before sharing her belief with anyone else.

The wellness director searched for Cardenas every day to give him medication because staff could not find him. Cardenas frequently left the facility and staff could not locate him for hours. He would "never remember" to sign out despite multiple explanations of the procedure. He was very confused and forgetful and did not know where he was going. He had to be directed to his room every day.

At several stand-up meetings in May, it was proposed that Cardenas be fitted with an ankle GPS monitor because he was "a high risk resident" and a "wander risk." Skiff was present but said nothing. When staff attempted to put the ankle monitor on Cardenas, he refused.

In September 2014, Cardenas told staff that he wanted to kill himself. The next day, a police officer responded to a call that Cardenas had walked away from The Manse and was possibly suicidal. The officer located him and observed he was upset and looked like he had been crying. Cardenas told the officer he was going to walk to Ventura on a "pilgrimage" to see

6

his ex-wife.

*Cardenas's death*

On December 21, 2014, Cardenas ran in front of a car and was killed. The collision occurred about 10 miles from The Manse.

Throughout that afternoon, motorists saw an elderly man running, walking, or standing on Los Osos Valley Road or adjacent Clark Valley Road. Four of these motorists testified about their observations. The man was not wearing exercise clothes. He ran back and forth across all four lanes of the highway without looking or turning his head. Drivers had to slam on their brakes or swerve to avoid hitting him. More than three hours after he was first observed, the man stood in traffic on Clark Valley Road waving, forcing a driver to swerve out of the way. A few minutes later, he ran into the middle of the road towards a car, forcing the driver to drive around him.

At about 6:00 p.m., it was "quite dark." A witness saw Cardenas standing in the center divider of Los Osos Valley Road. He ran into the path of a car and was struck. Cardenas died as a result of blunt force trauma.

*Expert testimony*

Dr. Manuel Saint Martin, a board-certified forensic psychiatrist and licensed attorney, testified that a dementia care plan is necessary to keep track of residents so they do not wander, and because individuals with dementia require additional care and supervision. Risks include getting lost, getting into accidents, being victimized by others, and exposure to the elements.

Because an RCFE is not a locked facility, available options include tracking monitors, adequate staff to ensure

7

patients do not leave the facility unassisted, and door protocols to observe who is leaving. Failure to have and comply with a dementia care plan would pose a danger to an individual who exhibited Cardenas's behaviors.

DISCUSSION

Skiff contends his convictions of involuntary manslaughter and elder abuse are not supported by substantial evidence that he was the proximate cause of Cardenas's death or that he had the intent required to commit either offense. He further contends regulations governing the operation of RCFEs prevented him from restricting Cardenas's movements.

In evaluating whether the judgment is supported by substantial evidence, we review the entire record in the light most favorable to the judgment, presume in support of the judgment every fact that can reasonably be deduced from the evidence in the record and determine whether any reasonable finder of fact could have found that the prosecution sustained its burden of proof beyond a reasonable doubt. (*People v. Mincey* (1992) 2 Cal.4th 408, 432.) We do not reweigh conflicting evidence or reevaluate the credibility of witnesses. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 200.)

*Involuntary Manslaughter*

Involuntary manslaughter "'requires proof that a human being was killed and that the killing was unlawful. [Citation.] A killing is 'unlawful' if it occurs (1) during the commission of a misdemeanor inherently dangerous to human life, or (2) in the commission of an act ordinarily lawful but which involves a high risk of death or bodily harm, and which is done 'without due caution or circumspection.'" [Citation.]'" (*People v. Guillen* (2014) 227 Cal.App.4th 934, 1026, quoting *People v.*

8

*Murray* (2008) 167 Cal.App.4th 1133, 1140.) "The failure to use due care in the treatment of another where a duty to furnish such care exists is sufficient to constitute that form of manslaughter which results from an act of omission." (*People v. Villalobos* (1962) 208 Cal.App.2d 321, 328.)

1. Criminal Negligence. The mental state required for the commission of involuntary manslaughter is criminal negligence. Skiff contends the evidence is insufficient to prove that he acted or failed to act in a criminally negligent manner. He is wrong.

Here, the jury was correctly instructed that Skiff was guilty of involuntary manslaughter if his criminally negligent failure to perform a legal duty caused Cardenas's death. (CALCRIM No. 582, modified.) The jury was further instructed: "*Criminal negligence* involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with criminal negligence when: [¶] 1. He or she acts in a reckless way that creates a high risk of death or great bodily injury; [¶] AND [¶] 2. A reasonable person would have known that acting in that way would create such a risk." (CALCRIM No. 582, modified, italics original.)

This instruction properly defined criminal negligence. (*People v. Butler* (2010) 187 Cal.App.4th 998, 1007-1009 (*Butler*).) "The question is whether 'a reasonable person in defendant's position would have been aware of the risk involved.'" (*Walker v. Superior Court* (1988) 47 Cal.3d 112, 136-137 [mother who treated daughter's meningitis with prayer properly prosecuted for involuntary manslaughter].) Substantial evidence supports the conclusion that it was objectively unreasonable to allow Cardenas to leave the facility and roam unsupervised without staff's

9

knowledge of his whereabouts.

A corporate officer may be guilty of involuntary manslaughter if he or she was aware of the omissions and failed to control them. (*Sea Horse Ranch, Inc. v. Superior Court* (1994) 24 Cal.App.4th 446, 457.) In *Sea Horse Ranch*, the corporate president knew of the poor condition of a corral fence and the history of horses escaping. When horses broke through the fence and ran onto an adjacent busy highway, the president was liable for the death of a motorist who struck one of the horses. (*Id.* at pp. 458-459.) Here, Skiff was aware of Cardenas's dementia, encouraged his admission, and condoned his unsupervised wandering. The jury properly found he was criminally negligent in his death.

A managing officer of a corporation with control over the operation of the business is personally responsible for acts of subordinates where the evidence "indicates inferentially appellant's toleration, ratification, or authorization of their illegal actions." (*People v. Conway* (1974) 42 Cal.App.3d 875, 886.) In *Conway*, the president of a car dealership was criminally liable for his staff's false sales representations "because as president of the dealership, he had the requisite control over the activities of the dealership and permitted the unlawful practices to continue after being informed of them on numerous occasions." (*Ibid.*)

Similarly here, there was substantial evidence that Skiff knew admitting Cardenas to the facility was unlawful and knew it was unsafe to allow him to wander in the community unsupervised, yet did nothing to protect him. Substantial evidence established that Skiff acted with criminal negligence when he disregarded the Alzheimer's diagnosis and the concerns of his staff, and when he allowed Cardenas to continue as a

10

resident of a facility that did not monitor or safeguard his activities but allowed him to wander without supervision.

        2. Proximate Cause. Involuntary manslaughter also requires substantial evidence that the defendant's conduct is a proximate cause of the victim's death. (*Butler, supra,* 187 Cal.App.4th at p. 1009.) Skiff insists he did not proximately cause Cardenas's death because "nothing that the staff at The Manse— much less Mr. Skiff—did or did not do caused Mr. Cardenas to be hit by a car." Again, he is wrong.

        A defendant's conduct is the proximate cause of a victim's death where "the death was a reasonably foreseeable, natural and probable consequence of the defendant's act, rather than a remote consequence that is so insignificant or theoretical that it cannot properly be regarded as a substantial factor in bringing about the death." (*Butler*, *supra*, 187 Cal.App.4th at pp. 1009-1010.)

        Proximate cause does not require that an act be the principal cause of death so long as it was "'a substantial factor contributing to the result.'" (*People v. Jennings* (2010) 50 Cal.4th 616, 643.) Where, as here, there is "an independent supervening act," "a cause of death is an act that sets in motion a chain of events that produces death as a natural and probable consequence of the act, and without which death would not occur." (*Id.* at p. 672.) To absolve a defendant of criminal liability, ""'the intervening cause must be 'unforeseeable . . . an extraordinary and abnormal occurrence.'"" (*People v. Brady* (2005) 129 Cal.App.4th 1314, 1325 (*Brady*).) "'Ordinarily the question will be for the jury'" unless the cause is "'so remote . . . that no rational trier of fact could find the needed nexus.'" (*Id.* at p. 1326.)

In *Brady*, the fatal collision of two firefighting airplanes was determined to be a foreseeable consequence of recklessly setting a fire. (*Brady*, *supra*, 129 Cal.App.4th at p. 1331.) Here, the fatal traffic collision was a foreseeable consequence of allowing a resident with dementia to run on public streets and highways without supervision. The failure to supervise Cardenas "set[] in motion a chain of events" that culminated in his running in front of a moving car. This outcome was tragic but neither "extraordinary" nor "abnormal."

Here, the jury was properly instructed that "[a]n act or omission caused the death of Mauricio Cardenas if his death was the direct, natural, and probable consequence of the act or omission and his death would not have happened without the act or omission. A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. . . . [¶] There may be more than one cause of the death of Mauricio Cardenas. An act or omission caused his death, only if it was a substantial factor in causing his death. A *substantial factor* is more than a trivial or remote factor. However, it does not have to be the only factor that caused the death of Mauricio Cardenas." (CALCRIM No. 240, modified, italics original.)

Applying this instruction, the jury found that appellant's conduct was a substantial factor in causing Cardenas's death. That finding is supported by substantial evidence. Cardenas had a history of leaving the building unattended, getting lost, and being confused and disoriented. He was struck by a car and killed while wandering along a busy highway, miles away from home, after having been absent from the facility for hours. This occurrence was readily foreseeable in light of

12

Cardenas's dementia diagnosis and history of wandering. The jury reasonably concluded that this failure to protect and care for Cardenas was a proximate cause of his death.

*Elder Abuse*

Skiff contends his conviction of felony elder abuse must be reversed because it is not supported by substantial evidence. He is incorrect.

Elder abuse liability applies to a person "having the care or custody of any elder or dependent adult" who "willfully causes or permits the elder or dependent adult to be placed in a situation in which his or her person or health is endangered." (Pen. Code, § 368, subd. (b)(1).) Here, the jury was correctly instructed that, to prove Skiff had engaged in elder abuse, the prosecution had to prove: (1) Skiff, having care or custody of the victim, willfully caused or permitted him to be placed in a situation where his person or health was endangered; (2) Skiff caused or permitted the victim to be endangered under circumstances or conditions likely to produce great bodily harm or death; (3) the victim was an elder; (4) when Skiff acted, he knew or reasonably should have known that the victim was an elder; and (5) appellant was criminally negligent when he caused or permitted the victim to be endangered. (CALCRIM No. 830, modified.)

Skiff does not challenge the jury instruction. Instead, he contends there is no substantial evidence that he acted in a criminally negligent manner that caused Cardenas to be placed in a dangerous situation. However, viewed in the light most favorable to the judgment, substantial evidence demonstrates that Skiff willfully permitted Cardenas to remain in a residential placement that was dangerous to him and that ultimately caused

13

his death.

Having accepted Cardenas as a resident with a diagnosis of Alzheimer's disease, The Manse was required to file a plan including "[s]afety measures to address behaviors such as wandering." (Cal. Code Regs., tit. 22, § 87705, subd. (b)(2).) But Skiff did not file a plan and did not institute measures adequate to address Cardenas's behaviors. Instead, Skiff allowed Cardenas to leave the facility at will, without signing out, and to roam the streets unsupervised without staff knowing his whereabouts.

Skiff knew The Manse was prohibited from accepting or retaining persons with dementia and that the facility had been repeatedly disciplined for violating those restrictions. Skiff knew Cardenas had been diagnosed with dementia and that he engaged in dangerous behaviors including wandering away from the facility, abusing alcohol, failing to take his medication, and behaving erratically. Instead of evicting Cardenas or assisting him in finding more suitable care, Skiff permitted him to remain at The Manse, over the objection of professional staff. This is substantial evidence of Skiff's criminal negligence.

Similarly, as we have discussed, there is substantial evidence that Skiff's criminal negligence was a proximate cause of Cardenas's death. On the day he died, Cardenas wandered away from the facility as he had done so many times before. He was unaccompanied and wandered for hours before he was struck by a car on a busy highway. The jury reasonably found these circumstances were foreseeable to Skiff. "Foreseeability does not require a high probability that the harm will occur, but merely that the harm be ""a possible consequence which might reasonably have been contemplated.""" (*Butler*, *supra*, 187

14

Cal.App.4th at p. 1011.) A reasonable person would contemplate that a person with dementia allowed to run along busy streets and highways at night unsupervised may be hit by a car and killed. The jury properly found that Skiff "proximately cause[d] the death of the victim," constituting elder abuse. (Pen. Code, § 368, subd. (b)(3).)

*Regulatory requirements*

Skiff contends that the law prohibited him from protecting Cardenas during his excursions. Amici curiae California Assisted Living Association and Argentum similarly contend that the conviction "whipsaw[s]" RCFE owners and operators between their obligations to foster independent living and to protect their residents. We are not persuaded.

Skiff relies upon *Olmstead v. L.C. ex rel. Zimring* (1999) 527 U.S. 581, 600 (*Olmstead*), which prohibits "unjustified institutional isolation of persons with disabilities." It is also true that RCFE residents have a right to be free from "involuntary seclusion." (Health & Saf. Code, § 1569.269, subd. (a)(10); Cal. Code Regs., tit. 22, § 87468.2, subd. (a)(8).) But these rights do not absolve an RCFE from its responsibility to provide supervision necessary for the safety of its residents.

The holding in *Olmstead* is "designed to ensure that disabled persons are . . . placed for treatment with the most possible community access, *taking into account their treatment needs.*" (*Black v. Department of Mental Health* (2000) 83 Cal.App.4th 739, 752, italics added; *Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676, 700.) While residents have a right "[t]o reasonable accommodation of individual needs and preferences in all aspects of life in the facility," there is an exception "when the health or safety of the

15

individual . . . would be endangered."  (Health & Saf. Code, § 1569.269, subd. (a)(16); Cal. Code Regs., tit. 22, § 87468.2, subd. (a)(14).)

The Manse did not have a dementia care plan including "[s]afety measures to address behaviors such as wandering."  (Cal. Code Regs., tit. 22, § 87705, subd. (b)(2).) Notwithstanding the absence of such a plan, The Manse knowingly accepted and retained a dementia patient whose safety it was not equipped to protect.

An RCFE must provide the "basic service[]" of "[b]eing aware of the resident's general whereabouts, although the resident may travel independently in the community." (Health & Saf. Code, § 1569.312, subd. (d).)  An RCFE "shall determine the amount of supervision necessary by assessing the mental status of the prospective resident to determine if the individual:  [¶] (1) tends to wander; [¶] (2) is confused or forgetful . . ."  (Cal. Code Reg., tit. 22, § 87461, subd. (a).)  Even though 602 forms existed allowing Cardenas to leave the facility unaccompanied, The Manse had a continuing obligation to monitor his conduct and update his pre-admission evaluation "as frequently as necessary to note significant changes . . . in the resident's . . . mental . . . condition."  (Cal. Code Regs., tit. 22, §§ 87463, subd. (a), 87705, subd. (c)(6).)  The Manse did not do so.

"The obligations imposed on [RCFEs] were obviously designed to prevent decedent's mental and physical problems from going unnoticed and untreated, so that harm to decedent could be avoided."  (*Klein v. Bia Hotel Corp.* (1996) 41 Cal.App.4th 1133, 1140 (*Klein*).)  In *Klein*, the RCFE argued that it was not responsible for a resident's apparent suicide because she had a constitutional right to end her own life.  (*Id.* at p. 1139.)

16

The court concluded that if such a right existed, it was irrelevant to the facility's obligation to comply with applicable regulations to protect her safety. By analogy here, Cardenas's right to "travel independently in the community" (Health & Saf. Code, § 1569.312, subd. (d)) and to "leave or depart the facility" (Cal. Code Regs., tit. 22, § 87468.1, subd. (a)(6)) did not absolve The Manse of its responsibility to monitor his condition and provide appropriate measures for his safety.

Cardenas consistently refused to sign out and refused to wear a GPS monitor. But that did not eliminate the licensee's obligation to protect him. If "the facility is not appropriate for the resident," it should have evicted him. (Cal. Code Regs., tit. 22, § 87224, subd. (a)(4).) There was substantial evidence that Skiff failed to take sufficient steps to monitor his safety despite knowledge of the dangers presented.

DISPOSITION

The judgment is affirmed.

<u>CERTIFIED FOR PUBLICATION.</u>

TANGEMAN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

17

Craig B. Van Rooyen, Judge

Superior Court County of San Luis Obispo

_____

James & Associates, Becky S. James and Lisa M. Burnett for Defendant and Appellant.

Hanson Bridgett, Adam W. Hofmann and David C. Casarrubias for California Assisted Living Association and Argentum as Amici Curiae on behalf of Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.