Billy STRINGFIELD II, Petitioner,

v.

The SUPERIOR COURT OF THE STATE OF CALIFORNIA, County of San Diego, Respondent.

Case No. 15–cv–547 DMS (JMA)

United States District Court, S.D. California.

Signed January 6, 2016

Robert Louis Ford, San Diego Office of the Primary Public Defender, San Diego, CA, for Petitioner.

Attorney General, State of California, Kevin R. Vienna, Office of the Attorney General, San Diego, CA, for Respondent.

## ORDER GRANTING PETITION FOR WRIT OF *HABEAS CORPUS*

Dana M. Sabraw, United States District Court Judge

On March 10, 2015, Petitioner Billy Stringfield II filed a Petition for writ of *habeas corpus* to prevent a successive prosecution arising from the death of his child. In 2005, Petitioner was tried for felony child abuse based upon injuries he inflicted on his child. The jury acquitted him of that charge. Years later the child died, allegedly from the same injuries originally inflicted by Petitioner. As a result, the State filed new charges in 2013 against Petitioner, this time for involuntary manslaughter and second degree implied malice murder. Petitioner claims this successive prosecution violates the Fifth Amendment to the United States Constitution as it places him twice in jeopardy and is precluded by the doctrine of collateral estoppel. Because the successive prosecution is based upon the same conduct and the same standard of culpability for which Petitioner was previously acquitted, the State is estopped from relitigating the issue.

### I.

### FACTUAL BACKGROUND[1]

Billy Stringfield III ("Billy") was born on January 24, 2005, to Petitioner Billy Joe Stringfield II and his wife. RT 71–72. Billy initially had trouble breathing, had difficulty breastfeeding, and was mildly anemic. RT 67, 80–81, 163–64.

---

1. The factual background is based on the testimony presented during Petitioner's first trial, as summarized by the State in opposition to Petitioner's Motion to Dismiss Based on Collateral Estoppel. *See* Pet., Ex. G (People's Resp. 4–16). The Reporters Transcript ("RT") citations are to the transcript of the 2005 trial. *See* Pet., Ex. G.

According to Petitioner, Billy fell twice, once on March 7 and once on March 8, 2005. RT 969–70. The first time, Billy's mother had placed him on a pillow, and he rolled off onto the floor. RT 971. The second time, Petitioner was home alone with Billy, and Billy fell off his lap while he reached for a bottle to feed him. RT 973–75. Later that evening, Billy was brought to the Balboa Hospital Emergency Room, where he was eventually seen by an experienced emergency doctor. RT 186–93. The doctor observed a mild abrasion on Billy's cheek and a red mark in the white part of his left eye, but otherwise did not note further injuries and did not suspect a head injury. RT 195–96. On a March 10, 2005 follow-up visit, nothing unusual was noted. RT 53.

On March 12, 2005, paramedics responded to a 911 call from the Stringfield's home, reporting that a baby was not breathing. RT 21–22. The paramedics were met at the gate by Billy's mother, then went into the apartment to find Petitioner holding Billy. RT 23. Billy appeared grayish and was wrapped in a blanket. *Id.* One of the paramedics observed Billy's eyes rolling back into his head and both described his condition as extremely grave. RT 35, 177–78. Both paramedics were troubled by the parents' apparent lack of concern for the child. RT 28–29, 180–81.

On transport to the emergency room, six-week-old Billy went into cardiac arrest and was revived after approximately 15 minutes. RT 41–42. A doctor spoke to the parents about the incident. RT 46. Billy's mother stated that she was breast-feeding him when he began choking and spit up some breast milk. RT 47. She went to the bathroom to clean up, leaving Billy with Petitioner. Petitioner stated he put Billy in his crib, and while in his crib Billy cried and spit up again, then "spazzed out" and was "just being retarded."

When his mother returned from the bathroom, Billy wasn't breathing. RT 48–49. The parents told the doctor that Billy had been in good health until coming to the emergency room. RT 52. They denied he had seized before. RT 53.

Once Billy stabilized, the doctors examined him and discovered numerous injuries, including bite marks, abrasions, and multiple bruises and hemorrhages, including brain hemorrhaging. RT 55–57, 215–16. The parents denied biting Billy. RT 63. Petitioner stated he had burped the baby forcefully and that his head had "whipped back and forth and he was all over the place." RT 218–19.

When examined, it was determined that Billy was neurologically impaired. Dr. Woods, who assumed his care, stated that as of March 17, 2015, Billy could not breathe or eat unassisted. RT 327–28. He stated (presciently) that Billy could not survive without assistance and would eventually die from his injuries, although it could be years later. RT 335, 350. He further stated that Billy's hemorrhaging resulted from substantial trauma within a couple weeks of his examination. RT 257–60.

Dr. Kerber, a neurologist, testified that Billy suffered both new and old injuries to his brain, with the most recent anywhere from hours to days before a CT scan on March 12, 2005. RT 424–26. He stated that a linear fall could not produce these injuries, but that they instead resulted from an acceleration/deceleration motion of the head. RT 432. During Billy's hospital stay, he developed hypoxic brain injuries from a lack of oxygen. RT 435. Dr. Kerber opined that while this could happen at birth, it was more recent because Billy's brain had not swelled until well after March 12, 2005. RT 435–36. Dr. Kerber stated that the injuries were consistent with overly aggressive burping, lift-

ing a baby from a crib without supporting its head, and "shuddering" a bay, a euphemistic term Petitioner used to describe his shaking of Billy. RT 448.

Petitioner testified that immediately after birth, Billy would frequently "shut down" and have a "glazed look" in the middle of "anything that he was doing[.]" RT 967–68, 972. He stated that he had bit Billy when he went into "panic mode" after Billy stopped breathing. RT 979. He admitted to getting frustrated with Billy, to "shuddering" him before putting him in his crib, and that during the "shuddering" Billy was not symptomatic. RT 982–85. He said he had told the doctors about Billy's abnormal behavior and that the doctors lied because they thought he was a child abuser. RT 999–1000. He admitted that he bruised Billy while shaking him and knew that babies are fragile and should not be shaken. RT 1000–02.

Petitioner's expert witness theorized that Billy had been hypoxic at birth from a small subdural hemorrhage that was reinjured from the short falls on March 7 and 8, 2005. RT 706, 756–57. He said that symptom onset was delayed, but ultimately manifested on March 12. RT 758. He further stated that unsupported lifting, shaking, and aggressive burping played no part in Billy's condition. RT 781. Petitioner's expert neurologist testified about seizures. RT 875. He stated that frequent seizures can lead to oxygen deprivation and can be fatal. RT 876. He stated that seizure disorders can result from hypoxia at birth, among other things. RT 880–84. Petitioner's biomechanics expert testified that Billy's injuries could not have been sustained from shaking because Billy's hemorrhages were bilateral, not anterior and posterior, and that Billy did not have a spinal injury. RT 503, 520. He opined that multiple falls can lead to cumulative effects and that shaking can result in injury. RT 536–37, 533.

In closing arguments, the prosecutor covered the essential elements of felony child abuse and went over Billy's injuries, including: bite marks, bruising, abrasions, scratches, retinal hemorrhages, bilateral subdural hematomas, brain bleeds, brain injuries, and neurologic devastation from hypoxia. RT 1010–11. The prosecutor argued that Petitioner lied to hospital staff because he knew he had abused Billy and was covering his tracks, that the retinal hemorrhages showed that the injuries resulted from shaking, and that his brain injuries were consistent with the brain moving back and forth in the skull. RT 1015–17. The prosecutor stated, "Together, when you look at his conduct, you look at the doctor's testimony, you put it together, the only logical conclusion is that Billy's injuries occurred from defendant's actions between March 10th and March 12th when he was frustrated and he was angry and he wanted him to stop crying." RT 1022–23. The prosecutor reiterated that the injuries were serious and inflicted by Petitioner, (id.), and asked the jury to consider all conduct leading up to March 12, 2005, in making their decision. Id.

## II.

## PROCEDURAL HISTORY

As a result of the events of March 2005, Petitioner was charged with felony child abuse under California Penal Code § 273a(a), with an allegation that he personally inflicted great bodily injury under California Penal Code § 12022.7(d) ("GBI allegation"). Pet., Ex. A (Information, filed May 31, 2005). The jury also was instructed with the lesser included offense of misdemeanor child abuse under California Penal Code § 273a(b). On January 3, 2006, the jury acquitted Petitioner of felony child abuse, and did not reach the § 12022.7 allegation. Pet., Ex. B (Verdict). The jury found Petitioner guilty of

misdemeanor child abuse. *Id.* The trial court sentenced Petitioner to probation, including a $1,000 fine and completion of a one year "Child Abuser Program." Pet., Ex. C. The court also kept in place a "stay away" order from Billy. *Id.*

Following Billy's death on November 24, 2011, the State charged Petitioner with three offenses: (1) second degree murder, (2) assault on a child causing death, and (3) involuntary manslaughter under California Penal Code §§ 187(a), 273ab(a), and 192(b), respectively. Pet., Ex. D (Complaint, filed September 30, 2013). The State is no longer pursuing assault on a child causing death under California Penal Code § 273ab(a).

Before the preliminary hearing commenced on the new case, Petitioner moved to dismiss the charges, arguing they were barred by collateral estoppel. Pet., Ex. H (Def.'s Mot. to Dismiss). The trial court denied the motion without prejudice. Pet., Ex. K (Mot. Hr'g Tr. 12:19–25). Petitioner re-raised the motion at the preliminary hearing, and it was again denied. Pet., Ex. L (Prelim. Hr'g Tr. 211:7–9).

Petitioner then moved to dismiss under California Penal Code § 995, renewing his arguments. Pet., Ex. M (Def.'s Second Mot. to Dismiss). The motion was denied. Thereafter, Petitioner filed a Petition for Writ of Prohibition with the California Court of Appeal, which was denied without citing authority on September 15, 2014. Pet., Ex. E.

Petitioner then filed a petition for review before the California Supreme Court, which was summarily denied on November 19, 2014. Pet., Ex. F. After exhausting his state remedies, Petitioner filed the instant *habeas* petition pursuant to 28 U.S.C. § 2241. Respondent does not dispute that review under § 2241 is proper, and further agrees that § 2241 review is *de novo.* *Stow v. Murashige,* 389 F.3d 880, 885 (9th Cir.2004).

## III.

## ANALYSIS

Petitioner contends his state prosecution for involuntary manslaughter and second degree implied malice murder is barred by both collateral estoppel and double jeopardy under the Fifth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment. Petitioner's collateral estoppel argument is dispositive.

### A. *Collateral Estoppel.*

■■■ The doctrine of collateral estoppel applies to criminal cases through the Fifth Amendment protection against double jeopardy. *Ashe v. Swenson,* 397 U.S. 436, 443–46, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). The Supreme Court in *Ashe* held that "[w]here a previous judgment of acquittal was based upon a general verdict," and where a defendant seeks to invoke the collateral estoppel doctrine to bar a subsequent prosecution regarding a particular issue, a court is required "to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' " *Id.* at 444, 90 S.Ct. 1189 (citation omitted). "Issues" refer not to secondary or subsidiary points of contention in a trial, but normally to dispositive issues or "issues of ultimate fact." *See Dowling v. United States,* 493 U.S. 342, 347, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990). Thus, "[w]hen an issue of fact or law is actually litigated and determined by a final and valid judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *United*

*States v. Hernandez,* 572 F.2d 218, 220 (9th Cir.1978) (citation omitted).

▮ The Ninth Circuit has adopted a three-step process to determine whether the bar of collateral estoppel applies:

> First, we identify the issues in the two actions to determine whether they are sufficiently material and similar to justify invoking the doctrine; second, we examine the record in the prior case to determine whether the similar issue was litigated; third, we examine the record of the prior proceeding to determine whether the issue was necessarily decided in the first case....

*Wilson v. Belleque,* 554 F.3d 816, 830 (9th Cir.2009). "A criminal defendant invoking collateral estoppel bears the burden of proving 'that the issue whose relitigation he seeks to foreclose was actually decided in his favor' in the prior case, ... and if this burden is not met, 'preclusive effect must be denied[.]' " *Id.* (citation omitted). The three-step process, however, "is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." *See Ashe,* 397 U.S. at 444, 90 S.Ct. 1189. "The inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' *Id.* (quoting *Sealfon v. United States,* 332 U.S. 575, 579, 68 S.Ct. 237, 92 L.Ed. 180 (1948)).

**B. *The 2005 Jury Trial and Successive Prosecution.***

Petitioner initially argues the jury in the 2005 trial decided that he did "not cause[ ] his child's brain damage through violent shaking." Pet. 13. He argues that when the jury acquitted him of "Felony Child Abuse and the Infliction of Great Bodily Harm they decided the issue of whether he shook his baby in Petitioner's favor." *Id.* He claims the "jury had to decide he did *not* perform an act likely to produce great bodily harm or death before they could find him guilty of misdemeanor child

abuse." *Id.* (citing jury instructions) (original emphasis). According to Petitioner, "[s]ince the jury determined [Petitioner] did not cause the brain injury through the acquittal on count one and the allegation, ... [Petitioner] is protected from prosecution for any charge in which causing great bodily harm or death [ ] is an essential element." Pet.'s Reply to Answer to Pet. 7 (internal quotation omitted).

The record, however, simply does not support these contentions. As discussed below, the Court need not address the first two requirements of collateral estoppel set out in *Wilson,* 554 F.3d at 830, because the foregoing arguments are doomed by the third requirement: "whether the issue was necessarily decided in the first case." To analyze whether the matters above were necessarily decided in the first case, an examination of the record of the prior trial is required, taking into account the charges, evidence, arguments of counsel, jury instructions, and verdicts rendered.

Petitioner was charged and tried under California Penal Code Section 273a(a), which defines felony child abuse to encompass both direct and indirect conduct, as follows:

> Any person who, under circumstances or conditions likely to produce great bodily harm or death, [1] willfully causes or permits any child to suffer, or [2] inflicts thereon unjustifiable physical pain or mental suffering, or [3] having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or [4] willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years.

Cal.Penal Code § 273a(a) (omnibus statute describing four types of conduct) (brackets

added). Penal Code § 273a(a) "includes both active and passive conduct, *i.e.,* child abuse by direct assault and child endangering by extreme neglect." *People v. Sargent,* 19 Cal.4th 1206, 1215–16, 81 Cal. Rptr.2d 835, 970 P.2d 409 (1999) (citation omitted). Additionally, all conduct prohibited by the statute is governed by two threshold requirements: "'first, the conduct must be willful; second, it must be committed 'under circumstances or conditions likely to produce great bodily harm or death.'" *Id.* at 1216, 81 Cal.Rptr.2d 835, 970 P.2d 409 (citations omitted).

The distinction between misdemeanor and felony child abuse is that felony abuse requires conduct committed "under circumstances or conditions likely to produce great bodily harm or death", (Cal.Penal Code § 273a(a)), whereas misdemeanor abuse may arise even if the conduct is committed "under circumstances *other than* those likely to produce great bodily harm[.]" Cal.Penal Code § 273a(b) (emphasis added).

Here, the State pursued the felony charge based on Petitioner's direct conduct—that he "willfully inflicted unjustifiable physical pain or mental suffering" on his child "under circumstances or conditions likely to produce great bodily harm or death." The jury was instructed, in pertinent part, as follows:

Every person who, under circumstances or conditions likely to produce great bodily harm or death, willfully inflicts unjustifiable physical pain or mental suffering on a child, is guilty of violation of Penal Code section 273a, subdivision (a), a crime.

* * *

In order to prove this crime, each of the following elements must be proved:

1. A person willfully inflicted unjustifiable physical pain or mental suffering on a child;

2. The person's conduct occurred under circumstances likely to produce great bodily harm or death.

Pet., Ex. P (CALJIC No. 9.37 (now CALCRIM 821)).[2] The jury was not instructed on passive or indirect conduct theories of culpability.[3] As to the GBI allegation, the jury was instructed, in part:

It is alleged in Count One that in the commission of a felony, the defendant personally inflicted great bodily injury on Billy S., a child under five years old.... If you find [ ] defendant guilty of Child Abuse, a felony, you must determine whether ... defendant personally inflicted great bodily injury on Billy S., a child under five years old in the commission of Child Abuse.

Pet., Ex. P (CALJIC No. 17.20). The trial court further instructed the jury on misdemeanor child abuse, which was defined in

---

2. Since the 2005 trial, a new edition of California criminal model jury instructions has issued. Formerly known as California Jury Instructions Criminal ("CALJIC"), they are now referred to as Judicial Council of California, Criminal Jury Instructions ("CALCRIM"). The jury instructions used in the 2005 trial will be referenced by their CALJIC number, while the current California jury instructions will be referred to by their CALCRIM number.

3. The California model jury instruction on felony child abuse provides a number of options to instruct the jury, depending on the theories advanced by the State. *See* CALJIC 9.37 (now CALCRIM 821). While the prosecution proceeded, and the jury was instructed, on the theory of direct infliction of physical pain or mental suffering, the prosecutor argued to the jury that it should consider all of the conduct attributed to Petitioner: "biting, bruising, failure to perform CPR, dropping Billy from his lap, and the shaking which resulted in his devastating brain injury." *See* Pet., Ex. I (People's Resp. 20).

similar terms as the felony but without the second element.

> Every person who: Willfully inflicts unjustifiable physical pain or mental suffering on a child is guilty of violating section 273a, subdivision (b) of the Penal Code, a misdemeanor.
>
> * * *
>
> In order to prove this crime, each of the following elements must be proved:
>
> 1. A person willfully inflicted unjustifiable physical pain or mental suffering on a child.

Pet., Ex. P (CALJIC No. 16.170).

■ As noted, Petitioner was acquitted of the felony child abuse charge and found guilty of misdemeanor child abuse. Because the jury acquitted on the felony count, it did not reach the GBI allegation, having been instructed to address the allegation only "if" it found Petitioner guilty of the felony. Nevertheless, Petitioner argues he was acquitted of the allegation by virtue of an implied acquittal. Pet. 16. He argues an implied acquittal results "from a verdict convicting a defendant on lesser included offenses rendered by a jury charged to consider both greater and lesser included offenses." *Id.* He further claims, without citing authority, that the GBI enhancement would have increased the punishment, and thus it "is considered to be part of the greater offense." *Id.* at 16–17. Following this logic, when the jury acquitted on the felony and convicted on the lesser included misdemeanor, it implicitly acquitted Petitioner of personally inflicting great bodily injury on a child. *Id.* at 17. The GBI allegation, however, is not an element of the greater offense. Petitioner's argument is therefore rejected.

Having acquitted on the felony count, the jury—as instructed—did not reach the GBI allegation and made no finding whether Petitioner inflicted great bodily injury on Billy. In addition, the jury's acquittal on the felony charge is not a finding of any

specific *fact;* rather, as discussed later, it is a finding on a broader issue, *i.e.*, that the State failed to prove beyond a reasonable doubt that Petitioner's conduct occurred under circumstances likely to produce great bodily harm or death. *See Santamaria v. Horsley,* 133 F.3d 1242, 1246 (1998) (citing *United States v. Watts,* 519 U.S. 148, 155, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (holding an acquittal "is not a finding of any fact. An acquittal can only be an acknowledgment that the government failed to prove an essential element of the offense beyond a reasonable doubt."). Further, while misdemeanor child abuse as alleged in the present case can arise when an accused commits abuse under circumstances *other than* those likely to produce great bodily harm or death, the jury was not instructed to make that specific finding and did not make any such finding; the sole finding the jury made by its misdemeanor conviction was that Petitioner willfully inflicted unjustifiable physical pain or mental suffering on his child. Thus, by virtue of the general verdicts, the jury did not find that Petitioner's conduct occurred (or did not occur) under circumstances likely to produce great bodily harm. Similarly, because there were no special verdict forms or "true" (or "not true") findings on any allegation, and the evidence portrayed a number of ways Petitioner could have inflicted unjustifiable pain and suffering on his child, including shaking, biting, bruising, dropping, etc., the jury was able to, and did, reach its general verdicts without deciding which specific wrongful acts occurred or did not occur.

Certainly the State focused on the shaking injuries in its case, but the jury was invited to consider all of the circumstances. The record reveals that each injury was contested by Petitioner, and multiple scenarios were advanced by both the prosecution and the defense. The jury could have

disregarded the State's shaking evidence in light of the expert witness testimony offered by Petitioner and decided the case based on evidence of biting, bruising and dropping. The State also presented expert testimony that as a result of Billy's condition he would experience severe pain, which could have caused the jury to focus on the mental suffering component of the charge to the exclusion of the other theories. The jury was not required to agree on the particular act committed by Petitioner, as no unanimity instruction was given. *See* CALCRIM 821 (Bench Notes, stating "the trial court 'does not have to instruct on unanimity if the offense constitutes a 'continuous course of conduct.'") (Citation omitted). Thus, despite Petitioner's protestations to the contrary, the jury was not required to (and did not) find that Petitioner did not (a) shake his child, (b) cause great bodily injury, or (c) commit an act under circumstances likely to cause great bodily harm or death. The Court therefore rejects Petitioner's collateral estoppel arguments to the extent they are based on those grounds.

Petitioner next argues the acquittal of felony child abuse precludes relitigation of the conduct attributed to Petitioner in March 2005, because the State failed to prove beyond a reasonable doubt that the conduct was committed "under circumstances likely to produce great bodily harm or death," and that is an issue that would be relitigated in the charges for involuntary manslaughter and second degree murder based on implied malice. This argument has merit.

**4.** The State makes the same argument with respect to second degree implied malice murder. That argument is addressed, *infra,* § III.B.2.

**5.** *Orlina* analyzes a closely related statute, California Penal Code § 273ab(a) (assault on a child resulting in death), which requires that the death result from an assault "by

### 1. *Involuntary manslaughter.*

In California, there are two statutorily-defined forms of involuntary manslaughter: (1) a killing "in the commission of an unlawful act, not amounting to a felony[,]" and (2) a killing "in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." Cal.Penal Code § 192(b). Both forms of involuntary manslaughter could be pursued by the State against Petitioner under the circumstances of the case, if not barred by collateral estoppel. Given the misdemeanor conviction, the first form of involuntary manslaughter (killing in the commission of an unlawful act) would be a logical choice. However, in opposing Petitioner's collateral estoppel argument both in state court and on *habeas,* the State has focused on the second form of culpability—commission of a lawful act which might produce death without due caution and circumspection.

▮ The State argues there is no bar to retrial because whether Petitioner committed an act under circumstances likely to produce great bodily injury or death is not an ultimate issue for involuntary manslaughter.[4] Resp.'s Answer to Pet. 17–19. In support, the State cites *Orlina v. Superior Court,* 73 Cal.App.4th 258, 86 Cal. Rptr.2d 384 (1999), a California Court of Appeal decision which addressed not collateral estoppel, but whether involuntary manslaughter is a lesser included offense of felony assault on a child causing death.[5] The State, quoting *Orlina,* correctly ar-

means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death[.]" The differences between that statute and the statute at issue in the present case, § 273a(a), are immaterial as the State relies on *Orlina* for its analysis of involuntary manslaughter, not § 273ab.

gues that felony child abuse requires a showing of reckless conduct, but goes astray when it argues that involuntary manslaughter only requires a showing of negligent conduct creating a "possibility" of death. Answer 18–19. Given different standards of culpability, the State argues, the issues in the two actions are sufficiently dissimilar that collateral estoppel does not apply. *Orlina* states:

> [The felony child abuse statute] is predicated on a *probability of great bodily injury* to the victim ..., while the second definition of involuntary manslaughter [lawful act which might produce death] is based on the *possibility of the death* of the victim. Section 273ab [felony assault on a child causing death] speaks to *reckless* conduct, ("likely to produce" injury) while the second definition of involuntary manslaughter encompasses *careless or negligent* conduct ("without due caution and circumspection"). It is therefore apparent the elements of involuntary manslaughter are not necessarily encompassed within the elements of section 273ab.

73 Cal.App.4th at 261–62, 86 Cal.Rptr.2d 384 (original emphasis). Under *Orlina*, the State claims involuntary manslaughter "[does] not require a *probability* of great bodily injury, it require[s] proof beyond a [reasonable] doubt of a lesser degree of risk for a more serious outcome: *possibility* of death." Answer 18–19 (original emphasis). But that argument is flatly inconsistent with the California Supreme Court's decision in *People v. Penny*, 44 Cal.2d 861, 879, 285 P.2d 926 (1955). So, too, is *Orlina*, and other intermediate courts citing the case.

In *Penny*, the court preliminarily noted that the "lawful act" contemplated by the involuntary manslaughter statute must be "one which 'might cause death.'" 44 Cal.2d at 869, 285 P.2d 926. There, the defendant used a poisonous substance to lawfully treat wrinkles. However, "indis-criminate use could be dangerous. Inasmuch as defendant was knowingly using poison in her treatment solution, the jury could have concluded that her treatment was one which could have caused death." *Id.* The Court then addressed the mens rea requirement when the "doing of an act ordinarily lawful which results in the death of a human being ..., being one which might cause death, is performed ... without due caution and circumspection." *Id.* at 870, 285 P.2d 926. The Court defined "due caution and circumspection" as requiring *criminal negligence,* a higher degree of negligence than mere carelessness:

> 'The negligence must be *aggravated, culpable, gross, or reckless,* that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences.' ... *The facts must be such that the fatal consequence of the negligent act could reasonably have been foreseen. It must appear that the death was not the result of misadventure, but the natural and probable result of a reckless or culpably negligent act.'*

*Id.* at 879–80, 285 P.2d 926 (emphasis added) (citation omitted). *Penny* makes clear that the language "commission of a lawful act which might produce death" simply means that the act caused the death, and that the mens rea of criminal negligence relates to the *manner* in which the act is performed (gross or reckless) and the accused's imputed *awareness* of the act (reasonable person standard). Because *Orlina* improperly reads the "might produce death" language into the "without due caution and circumspection" language, and concludes that all that is required is careless or negligent conduct to trigger culpability under the statute, it is not only unpersuasive but contrary to controlling law.

■ Indeed, it is settled that criminal negligence is the governing mens rea standard for all forms of involuntary manslaughter in California. *See People v. Butler,* 187 Cal.App.4th 998, 1007, 114 Cal. Rptr.3d 696 (2010) (collecting cases and citing *Penny,* 44 Cal.2d at 869, 285 P.2d 926 (lawful act without due caution and circumspection means with criminal negligence); *People v. Wells,* 12 Cal.4th 979, 988, 50 Cal.Rptr.2d 699, 911 P.2d 1374 (1996) (misdemeanor causing death must be committed with criminal negligence)).

Notably, the California model jury instruction on involuntary manslaughter tracks *Penny* and *Wells.* It provides, in part:

> To prove the defendant guilty of this crime, the People must prove that:
>
> 1. The defendant committed (a crime/ [or] a lawful act in an unlawful manner);
>
> 2. The defendant committed the (crime/ [or] act) with criminal negligence; AND
>
> 3. The defendant's acts caused the death of another person.

CALCRIM 581 (original parentheticals and brackets) (Bench Notes, citing *Wells* and *Penny* ). The jury instruction goes on to define criminal negligence consistent with *Penny:*

> Criminal negligence involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with criminal negligence when:
>
> 1. He or she acts in a *reckless way that creates a high risk of death or great bodily injury;* AND

> 2. A reasonable person would have known that acting in that way would create such a risk.
>
> In other words, a person acts with criminal negligence when the way he or she acts is so different from the way an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act.

*Id.* (emphasis added). Consequently, in any successive prosecution for involuntary manslaughter, a conviction could only be based upon conduct that Petitioner committed in a criminally negligent manner, that is, in an objectively reckless way that a reasonable person would know creates a high risk of death or great bodily injury.

■ Criminal negligence, as reflected in case law and CALCRIM 581, contains two objective prongs: (1) an act committed in a reckless way that creates a high risk of death or great bodily injury, and (2) a reasonable person would have known that acting in such a way would create such a risk. The second prong, if met, imputes knowledge or awareness of the risk to the accused. *See Butler,* 187 Cal.App.4th at 1008, 114 Cal.Rptr.3d 696 (" '[A] man of ordinary prudence would foresee that the act would cause a high risk of death or great bodily injury.' ") (Citation omitted). The State's arguments to the contrary are therefore rejected.

■ The identical requirements exist for felony child abuse based on *indirect* conduct; the mens rea for such child abuse is criminal negligence. *See People v. Valdez,* 27 Cal.4th 778, 789, 118 Cal.Rptr.2d 3, 42 P.3d 511 (2002).[6] And in the case of

---

**6.** The conduct prohibited by the felony child abuse statute for indirect abuse, "or any statute requiring criminal negligence, is not 'accidental[ ],' but a gross departure from the conduct of an ordinarily prudent person." *Valdez,* 27 Cal.4th at 789, 118 Cal.Rptr.2d 3,

42 P.3d 511. *Valdez* cites with approval *Penny's* definition of criminal negligence. *Id.* at 783, 118 Cal.Rptr.2d 3, 42 P.3d 511. The California model jury instruction on felony child abuse also tracks *Penny:* "Criminal

child abuse based on *direct* infliction of unjustifiable harm or suffering, the mens rea is nearly identical—requiring general criminal intent to inflict unjustifiable harm or suffering, and the equivalent of the first prong of criminal negligence (recklessness) to show that the act was committed under circumstances likely to produce great bodily harm or death. *See Sargent,* 19 Cal.4th at 1222–23, 81 Cal.Rptr.2d 835, 970 P.2d 409.

Specifically, the mens rea for direct infliction of unjustifiable harm or suffering is the intent to perform the underlying injurious act on the child. *Sargent,* 19 Cal.4th at 1224, 81 Cal.Rptr.2d 835, 970 P.2d 409. The defendant must have the mens rea of general criminal intent to commit the proscribed act of unjustifiably inflicting pain or suffering. *Id.*

However, the element regarding infliction of abuse "under circumstances or conditions likely to produce great bodily harm or death" is "extrinsic to the intent element of the crime." *Valdez,* 27 Cal.4th at 786, 118 Cal.Rptr.2d 3, 42 P.3d 511 (quoting *Sargent,* 19 Cal.4th at 1223, 81 Cal. Rptr.2d 835, 970 P.2d 409). The language "under circumstances likely to produce great bodily harm or death" simply "states the context" in which the infliction of unjustifiable physical pain or mental suffering must occur for felony culpability. *Sar-*

*gent,* 19 Cal.4th at 1223, 81 Cal.Rptr.2d 835, 970 P.2d 409. To prove that context, the State must show that the defendant's conduct occurred "under conditions 'in which the probability of serious injury is great.'" *Id.* (citations omitted). Notably, this "context" determination does not require proof of objective awareness. As stated in *Sargent,* the actor "may neither anticipate nor have any particular intent or knowledge with respect to [this] extrinsic matter[.]" *Id.* Therefore, to prove the extrinsic element, the State need only establish that the abuse was committed under circumstances in which the probability of serious harm or death was high.[7]

The new version of the California model jury instruction on felony child abuse by direct infliction tracks *Sargent.* It provides: "The phrase *likely* to produce (great bodily harm/ [or] death) means the probability of (great bodily harm/ [or] death) is high." CALCRIM 821 (original emphasis, parentheticals, and brackets). That language plainly sets out the first prong of criminal negligence—*i.e.,* that the accused act in a reckless way that creates a high risk of death or great bodily injury. The reasonable person prong of criminal negligence (that a reasonable person would have known that acting in that way would create such a risk) is not required. Thus, proof that an accused's infliction of unjusti-

---

negligence involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with criminal negligence when: 1. He or she acts in a reckless way that is a gross departure from the way an ordinarily careful person would act in the same situation; 2. The person's acts amount to disregard for human life or indifference to the consequences of his or her acts; AND 3. A reasonable person would have known that acting in that way would naturally and probably result in harm to others." *See* CALCRIM 821.

**7.** As stated in *Sargent,* the "context" argument is nevertheless often framed in terms of

criminal negligence: "Thus in this case, while defendant denied any awareness that his actions were likely to harm [the child], any reasonable person would recognize that shaking a four-and-a-half-month-old infant, who had been born three months prematurely and had the neck development of a four to six-week-old, with the force equivalent to dropping him out of a second story window, was a circumstance or condition likely to result in great bodily harm or death." 19 Cal.4th at 1222, 81 Cal.Rptr.2d 835, 970 P.2d 409 ("We note this inquiry, as a practical matter, will in most cases not differ significantly from the imposition of a criminal negligence mens rea element[.]").

fiable physical pain or mental suffering "occurred under circumstances likely to produce great bodily harm or death" only requires a showing of gross or reckless conduct (creating a high probability of great bodily harm or death) but not objective awareness of the risk of such conduct.

Here, the jury rendered its verdicts after hearing all the evidence about Petitioner's conduct, the conflicting expert testimony about shaking and shaking injuries, the child's condition at birth, and the injuries suffered by the child. After summarizing that evidence, the prosecutor argued:

> How can you have that callous of a disregard for what's going to happen with your baby? Because he wasn't thinking about Billy anymore.... He was thinking about what's going to happen to me.... He didn't care about his son. He inflicted these injuries, and he doesn't care. He's cold. He's the kind of man that would bite his baby. He's the kind of man that bruised his baby. He's the kind of man that shook his baby. And now he needs to be held responsible and found guilty of Count 1, felony child abuse, and the allegation of inflicting great bodily injury.

RT 1083–84.

The prosecutor's argument to the jury was framed in textbook criminal negligence terminology; it was predicated on the argument that Petitioner's "callous disregard" for his child through shaking, biting, and bruising was not only evidence of intentional infliction, but "cold", done without care ("he didn't care" and "he doesn't care"), and likely to cause great bodily injury. That is the essence of criminal negligence—"aggravated, culpable, gross, or reckless, ... such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an

indifference to consequences." *Penny*, 44 Cal.2d at 879–80, 285 P.2d 926. As noted in *Sargent*, proving that an act was done under circumstances likely to produce great bodily harm or death mirrors the requirements for proving the first prong of criminal negligence (recklessness), without the need to show objective awareness based on a reasonable person standard. 19 Cal.4th at 1222, 81 Cal.Rptr.2d 835, 970 P.2d 409. Similarly, the CALCRIM model jury instruction on felony child abuse only requires proving that the "probability of great bodily harm or death is high[,]" (CALCRIM 821), which is the identical showing required to prove the first prong of involuntary manslaughter. *See* CALCRIM 581 ("He or she acts in a reckless way that creates a high risk of death or great bodily injury").

The State argued to the jury that all of Petitioner's conduct should be considered, particularly the evidence regarding shaking, and that the jury should find Petitioner guilty of felony child abuse based on the totality of circumstances and the recklessness of Petitioner's conduct. The State would make the same arguments based on the same conduct in any successive prosecution for involuntary manslaughter. It would have to in order to prove criminal negligence, an essential element of involuntary manslaughter. Because Petitioner was acquitted of felony child abuse under a conceptually identical standard, any jury in a successive prosecution could not find Petitioner criminally negligent without grounding its verdict upon an issue already determined in Petitioner's favor.

As noted, in acquitting on the felony charge, the jury considered not only whether Petitioner shook the victim, but *all* the other conduct attributed to Petitioner. The jury's conviction on the misdemeanor for that conduct means it found Petitioner did willfully inflict unjustifiable

physical pain or mental suffering on Billy. Taken together, acquitting Petitioner of the felony and convicting on the misdemeanor, the jury necessarily decided that the State *failed* to prove beyond a reasonable doubt that *any* of the conduct attributed to Petitioner in March 2005, including shaking, biting, and bruising (*i.e.,* the unjustifiable infliction of physical pain or mental suffering), occurred under circumstances likely to produce great bodily harm or death.

Collateral estoppel is not to be applied "with the hypertechnical and archaic approach of the 19th century pleading book, but with realism and rationality." *Ashe,* 397 U.S. at 444, 90 S.Ct. 1189. It also must be applied in a practical manner and " 'viewed with an eye to all the circumstances of the proceedings.' " *Id.* (quoting *Sealfon,* 332 U.S. at 579, 68 S.Ct. 237). The State's argument against application of collateral estoppel is too narrow, and founded on incorrect law. It argues involuntary manslaughter requires proof of a "lesser degree of risk" of great bodily harm or death than does felony child abuse, and thus, the issues sought to be litigated are not the same. As discussed, that is not so. And it argues there is no bar to retrial because whether Petitioner committed an act under circumstances likely to produce great bodily injury or death is not an ultimate issue for involuntary manslaughter. It is true that involuntary manslaughter does not contain an element stated in those precise terms, but it does contain an element that is conceptually identical, that is, the commission of an

act in a reckless way that creates a high risk of death or great bodily harm. CAL-CRIM 581. That is the *identical* inquiry used to determine whether one accused of felony child abuse committed an act under circumstances where the probability of great bodily harm or death is high. CAL-CRIM 821.

■ Applying the doctrine with realism, in a "practical frame," and viewed with an eye to all the circumstances of the proceedings, a jury in a successive trial could not ground its verdict upon an issue other than that which Petitioner seeks to foreclose from consideration. In order to convict on involuntary manslaughter, the jury would have to evaluate the same conduct attributed to Petitioner and determine whether that conduct was committed in a gross or reckless manner. The prior jury made an equivalent assessment and acquitted. Because that issue was litigated and actually decided in Petitioner's favor, it is foreclosed from further litigation.[8] Further, because that issue is essential to conviction for involuntary manslaughter, the successive prosecution for that charge is barred.

2. *Second Degree Implied Malice Murder.*

■ It is well-settled that involuntary manslaughter is a lesser included offense of murder. *People v. Rios,* 23 Cal.4th 450, 460, 97 Cal.Rptr.2d 512, 2 P.3d 1066 (2000). "The distinguishing feature is that murder includes, but manslaughter lacks, the element of malice." *Id.* The second degree murder charge at issue is based upon an unintentional killing committed with implied malice.[9] Implied mal-

**8.** While an acquittal is not a finding of any specific *fact,* (*Santamaria,* 133 F.3d at 1246), it is a determination that the State "failed to prove an essential element of the offense beyond a reasonable doubt." *Id.* In that respect, the acquittal is a determination of a dispositive, or ultimate, issue. *See Dowling,* 493 U.S. at 347, 110 S.Ct. 668 (holding issues of fact or law refer not to secondary or sub-

sidiary points of contention in a trial, but normally to dispositive issues.)

**9.** To prove implied malice, the State must show: "1. [Petitioner] intentionally committed an act; 2. The natural and probable consequences of the act were dangerous to human life; 3. At the time [he] acted, [he] knew [his] act was dangerous to human life;

ice contains both an objective and subjective component. The objective component relates to the defendant's act and requires that the defendant "does an act that is likely to cause serious injury or death to another[.]" *People v. Knoller*, 41 Cal.4th 139, 153, 59 Cal.Rptr.3d 157, 158 P.3d 731 (2007) (citation omitted). The subjective component requires an awareness of the risk of death—a "conscious disregard for life." *Id.* at 154–56, 59 Cal.Rptr.3d 157, 158 P.3d 731. Thus, implied malice depends upon a determination that the defendant actually appreciated the risk of death. Criminal or gross negligence, in contrast, only depends upon the objective test (the defendant's act), and thus, it is a lesser included offense.

 Because Petitioner was acquitted under a mens rea standard equivalent to gross or criminal negligence, the State cannot use the same conduct to prove the objective prong of implied malice—that Petitioner committed an act likely to cause serious injury or death. Accordingly, Petitioner's prosecutions for involuntary manslaughter and second degree implied malice murder are barred by the doctrine of collateral estoppel as embodied in the Fifth and Fourteenth Amendments.[10]

## IV.

## CONCLUSION

The Petition for writ of *habeas corpus* under 28 U.S.C. § 2241 is granted. Petitioner may not be retried for involuntary manslaughter or second degree implied malice murder based upon the conduct

AND 4.[He] deliberately acted with conscious disregard for (human ...) life." CALCRIM 520.

attributed to him at the trial for felony child abuse.

**IT IS SO ORDERED.**

10. The Court declines to address the double jeopardy arguments, as collateral estoppel precludes further prosecution of the stated charges.