Filed 10/5/22  P. v. Montejano CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Yuba)

----

| | |
|---|---|
| THE PEOPLE, | C094578 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF1902281 ) |
| v. | |
| ERIC MONTEJANO, | |
| Defendant and Appellant. | |

After a jury trial, defendant Eric Montejano was found guilty of assault on a child causing death, second degree murder, and child abuse likely to produce great bodily harm or death on a child under the age of five.  The trial court sentenced defendant to 25 years to life in prison.  On appeal, defendant contends the trial court erred by failing to instruct the jury on nonstatutory involuntary manslaughter and by failing to inquire of each individual juror about his, her, or their ability to be fair after a doctor who served as an expert witness at trial rendered medical aid to an alternate juror.  Defendant further contends his case must be remanded for the trial court to resentence him under various amendments to the Penal Code that took effect after his original sentencing.  We agree defendant's case must be remanded for resentencing but disagree with the remainder of defendant's arguments.  We thus affirm the judgment of conviction, vacate defendant's sentence, and remand for resentencing.

1

## FACTUAL AND PROCEDURAL BACKGROUND

On December 20, 2019, defendant arrived home to his girlfriend and five-week-old son at approximately 9:40 p.m. For several hours thereafter, defendant and his girlfriend both drank alcohol while defendant played video games and his girlfriend cuddled with the baby on the couch. Defendant had three or four 12-ounce cups of gin and tonic, while his girlfriend had one gin and tonic and an alcoholic cider. At 1:40 a.m., defendant's girlfriend decided to take a shower. She was in the bathroom for 30 to 35 minutes.

When defendant's girlfriend came out of the bathroom, she saw defendant sleeping on the couch with the baby on his chest. The baby was wearing a different outfit than he had been wearing when defendant's girlfriend left to take a shower. Defendant's girlfriend went to the couch and noticed the baby sounded as though he was struggling to cry. It was a sound defendant's girlfriend had never heard before. When she picked up the baby, he spewed out a dark substance that looked like blood. Defendant's girlfriend took the baby to the bedroom where there was light, and saw his entire lip and left side of his face was swollen.

Defendant's girlfriend woke defendant and told him they had to go to the hospital. Defendant's girlfriend asked defendant what he had done, and defendant eventually admitted he had hit the baby one time. Defendant was hesitant about going to the hospital, but ultimately agreed. On the way to the hospital, defendant repeatedly hit himself in the head. Once at the hospital, defendant dropped his girlfriend and the baby off and parked in the parking lot where he stayed for several hours before eventually going home.

Police officers met defendant at his home upon his return. He agreed to go with them to the police station. During a police interview, defendant admitted hitting the baby with an open palm five times while holding him and forcefully grabbing the back of his neck. He said he did not mean to hit the baby so hard. Defendant reenacted hitting the

2

baby for police officers.  During a search of defendant's home, officers also found the clothing the baby had been wearing before his mother got in the shower.  The clothing had blood on it.

The baby was transferred to the University of California Davis Medical Center. Upon arrival, the baby was struggling to breathe and had to be intubated.  A scan of the baby's brain revealed extensive subarachnoid and subdural hemorrhaging on both sides of the brain; however, the hemorrhaging was more severe on the left side.  The baby also had diffuse cell death throughout his brain, as well as bruising to the brain itself and an occipital fracture.  The baby had what is commonly referred to as a traumatic brain injury.

According to Dr. Julia Magana, the baby's treating physician and expert in child abuse, pediatric trauma, and abusive head trauma, the baby's injuries were of the type usually seen with "significant acceleration, deceleration injuries."  Such injuries were generally attributed to incidents of shaking and blunt force trauma, as well as accidental causes such as car accidents where the child is ejected from the car.  In Dr. Magana's opinion, the baby's injuries were not the result of an accidental injury but instead the result of child physical abuse or inflicted injury.  She based this opinion on some of the baby's other injuries, such as his ear being swollen and bruised, which is very uncommon for a five-week-old child.  The baby also had little red dot bruises on his skin at the top of his cheeks, which indicated the baby had been strangled causing the small blood vessels in that region to burst.  There further were burst blood vessels on the baby's abdomen and "concern for a fracture," indicating blunt force trauma to the back of his head.  The baby had bruising on his jawline, which is commonly seen in victims of shaking injuries. Further, there was swelling on the baby's nose and between his eyebrows indicating he experienced blunt force trauma.  And finally, the flesh connecting the baby's upper lip to his gums was torn, which typically occurs with blunt force trauma to the face or forcefully giving a child a pacifier or bottle.

3

Because the baby had blood throughout his brain and diffuse brain cell death, he experienced continuous seizures and surgery was not an option. Given the injuries and seizures, the baby would never walk or talk or "in any way, shape or form have a normal life and [would not] know anything other than pain." On January 3, 2020, the baby was removed from life support and died.

At trial, Dr. Magana watched defendant's reenactment of how he hit the baby five times. She believed the force demonstrated could "absolutely cause" the baby's injuries, stating, "I think there was more than what was described there. I would have expected more force than just, you know, a few times given the constellation of injuries. But it was that or more, absolutely."

Defendant testified at trial that for the few nights before the incident, the baby was not well. He had been crying a lot and spitting up his meals. At birth, the baby had trouble breathing and spent several days in the neonatal intensive care unit. Since the baby's release from the hospital, the baby had eight or nine doctor's visits. In fact, the baby had another appointment scheduled for the morning he was taken to the hospital.

Defendant testified that after coming home that evening, he drank one gin and tonic with the equivalent of two shots in it before drinking only tonic water. At midnight, the baby took his prescribed medicine and was fussy. Defendant's girlfriend walked the baby around the front of the apartment trying to calm him down. Defendant testified that, while walking around the living room, his girlfriend tripped and fell on the ground. The baby hit the ground and his bottle fell out of his mouth.

Defendant testified his girlfriend stood up after the fall and went to the kitchen with the baby. The baby was not breathing properly and was gasping for air. Defendant claimed his girlfriend then put the baby on his back and slapped the baby's face. She slapped the baby one more time but harder. After the second slap, defendant saw blood on his girlfriend's hands and on the baby's clothing. Defendant told his girlfriend to take a shower and change. Defendant then changed the baby.

4

Defendant testified he did not call an ambulance because the baby had a doctor's appointment the next day.  The baby did not appear seriously injured and was making noises.  The baby also did not have swelling.  When his girlfriend came out of the shower, she insisted they go to the hospital, so they went.  Defendant told his girlfriend that if medical staff asked questions about the baby's injuries, to say he was responsible.  Defendant covered for his girlfriend in his statement to police because he did not want her to get into trouble.

Following trial, a jury found defendant guilty of assault on a child causing death, second degree murder, and child abuse likely to produce great bodily harm or death.  The jury further found true an enhancement to the child abuse offense, that the baby was a child under the age of five.  The jury further found defendant not guilty of attempting to dissuade a witness.  The trial court sentenced defendant to 25 years to life for the assault on a child causing death conviction, 15 years to life for the second degree murder conviction, and 12 years for the child abuse conviction and attached enhancement.  It stayed imposition of the sentence for the murder and child abuse convictions pursuant to Penal Code[1] section 654.

Defendant appeals.

## DISCUSSION

### I

*The Trial Court Did Not Err By Failing To Sua*

*Sponte Instruct The Jury On Nonstatutory Involuntary Manslaughter*

Defendant contends the trial court erred by failing to instruct the jury with the nonstatutory definition of involuntary manslaughter even though he never requested the instruction.  He argues he was entitled to the instruction because nonstatutory involuntary

---

[1]     Further undesignated section references are to the Penal Code.

manslaughter is a lesser included offense of his charged offenses of murder and assault on a child causing death. We disagree defendant was entitled to the instruction.

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. . . . That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) " 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]" ' that the lesser offense, but not the greater, was committed." (*Id.* at p. 162.) " '[T]he existence of "any evidence, no matter how weak" will not justify instructions on a lesser included offense.' " (*People v. DePriest* (2007) 42 Cal.4th 1, 50.) We review de novo a failure to instruct on a lesser included offense. (*People v. Cook* (2006) 39 Cal.4th 566, 596.)

Section 192, subdivision (b) provides that involuntary manslaughter occurs "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." Despite section 192's specification of an act "not amounting to a felony," authority exists for a nonstatutory form of involuntary manslaughter to apply based on the predicate act of a noninherently dangerous felony committed without due caution and circumspection. (E.g., *People v. Butler* (2010) 187 Cal.App.4th 998, 1007.) "[A]n instruction on involuntary manslaughter as a lesser included offense must be given when a rational jury could entertain a reasonable doubt that an unlawful killing was accomplished with implied malice during the course of an inherently dangerous assaultive felony." (*People v. Brothers* (2015) 236 Cal.App.4th 24, 34 (*Brothers*).)

The Fourth Appellate District, Division Three, has held that involuntary manslaughter is not a lesser included offense of assault on a child causing death. (*Orlina v. Superior Court* (1999) 73 Cal.App.4th 258, 261-262 [assault on a child causing

6

death, a general intent crime, requires " 'force that to a reasonable person would be likely to produce great bodily injury' "; involuntary manslaughter is a lesser related offense because it requires an " 'act which might produce death' " performed with conscious disregard].)  This holding, however, has been questioned.  (*Stringfield v. Superior Court* (2016) 166 F.Supp.3d 1144, 1153-1157; *id*. at p. 1157 ["proving that an act was done under circumstances likely to produce great bodily harm or death mirrors the requirements for proving the first prong of criminal negligence (recklessness), without the need to show objective awareness based on a reasonable person standard"].)  These cases agree that assault on a child causing death is a general intent crime that does not require a showing of malice.  (*Stringfield*, at p. 1156; *Orlina*, at pp. 261-262; see *People v. Albritton* (1998) 67 Cal.App.4th 647, 656.)  In other words, even if the trial court instructed the jury on nonstatutory involuntary manslaughter and the jury believed defendant lacked malice, the jury would not have necessarily acquitted him of assault on a child causing death.  Thus, in the end, the instruction related to nonstatutory involuntary manslaughter was irrelevant to the jury's determination of defendant's guilt of assault on a child causing death.

"Involuntary manslaughter is ordinarily a lesser offense of murder."  (*People v. Abilez* (2007) 41 Cal.4th 472, 515.)  There is no sua sponte duty to instruct on involuntary manslaughter, however, where "the defendant indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, and no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed."  (*Brothers*, *supra*, 236 Cal.App.4th at p. 35; see *People v. Bryant* (2013) 56 Cal.4th 959, 965 (*Bryant*) [components of implied malice are "the performance of 'an act, the natural consequences of which are dangerous to life,' " by a person who " 'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life' "].)

7

In *Bryant*, *supra*, 56 Cal.4th at pages 963 and 971, an involuntary manslaughter instruction would have been appropriate where neighbors found the victim lying face down and the defendant screaming and pleading for the victim to wake up; the defendant had thrust a knife once at the victim as the victim lunged at the defendant, causing the knife to enter the victim's chest; and the defendant testified the stabbing was not deliberate. In contrast, an involuntary manslaughter instruction was not warranted in *Brothers* where, crediting the defendant's testimony she "did not know 'this was going to happen,' " the defendant's testimony "unequivocally established she engaged in a deliberate and deadly assault because she had been enraged, 'out of control,' and unable to calm herself." (*Brothers*, *supra*, 236 Cal.App.4th at p. 34.)

This case is like *Brothers*. As an initial matter, we note defendant's defense was that he did not inflict injury to the baby. This testimony was rejected by the jury and did not support a theory that defendant negligently inflicted the baby's injuries. The other evidence presented as to defendant's conduct and intent was derived from defendant's police interviews and the expert testimony. During those interviews, defendant said he hit the baby five times because he was frustrated by the baby's crying and he did not think he had hit the baby hard enough to inflict serious injuries. He further admitted that in addition to hitting the baby, he forcefully grabbed the back of the baby's neck. Further, expert testimony established the baby suffered from an acceleration/deceleration injury, likely caused by shaking the baby. Based on this evidence, the jury found defendant deliberately inflicted injury on a child, the natural and probable consequences of which was death. This finding fulfills the implied malice requirement that defendant performed an act, the natural consequences of which were dangerous to human life.

Further, no material issue was presented demonstrating defendant lacked a subjective appreciation his conduct posed a danger to human life. While defendant claimed to not realize he hit the baby with a hard force, the evidence established defendant's recitation of his conduct was disingenuous. Dr. Magana testified the injuries

8

to the baby not only supported defendant having slapped the baby five times with the force he demonstrated, but also defendant having shaken, strangled, and hit the baby with blunt force. Additionally, the force used was so extreme that it immediately rendered the baby in visible distress, causing difficulty breathing and blood in the baby's mouth. Instead of seeking immediate help, defendant attempted to hide his conduct by changing the baby out of bloodied clothes and sleeping with the baby on the couch. He then attempted to persuade his girlfriend not to go to the hospital. This conduct exhibits a consciousness of guilt not present in *Bryant*. (*Bryant*, *supra*, 56 Cal.4th at pp. 963, 971.) The baby's injuries were also severe, including hemorrhages, bleeding on the brain, diffuse brain cell death, and seizures. The injuries were focused on the baby's head, a vital and vulnerable area of the body, especially for a five-week-old child. The totality of these circumstances put defendant's case in a much different position than that of *Bryant* and instead resembles the circumstances in *Brothers*. Accordingly, the trial court did not err by failing to instruct the jury on nonstatutory involuntary manslaughter.

II

*The Trial Court Did Not Abuse Its Discretion By Failing To Individually Question Jurors After A Prosecution Witness Delivered Medical Aid To An Alternate Juror*

Defendant contends the trial court had a sua sponte duty to individually question jurors on their ability to be fair and impartial after watching Dr. Magana render emergency medical aid to an alternate juror during trial. Defendant argues the jurors were obviously biased and the trial court should have sua sponte declared a mistrial. We disagree.

A

*Background*

At the start of Dr. Magana's cross-examination, Alternate Juror No. 2 said she felt like she was going to "pass out." Dr. Magana asked the trial court whether she could go to the juror, and the court allowed it. The trial court called a recess and ordered the

9

courtroom cleared. No further proceedings were recorded until the parties later reconvened in the law library.

At that time, the trial court summarized the preceding events as follows: "One of the alternate jurors, alternate juror number two, she indicated, and it was on the record, that she was about to pass out. She proceeded to exhibit severe medical issues. We, of course, had a medical doctor on the stand who immediately began to provide appropriate medical treatment in the Court's opinion. This, of course, was observed by the entire jury panel. I instructed the jurors that we were taking a recess . . . . [B]ecause of COVID, we didn't have the full jury box filled. But we had a few jurors, the other alternate and two other jurors, were sitting up there to better view the video screen. They did stay behind a little bit longer and observed the medical treatment being provided by Dr. Magana.

"I did observe the -- ultimately, I instructed those jurors to please vacate the courtroom. I observed [Alternate Juror No. 2] comment to the doctor how effective her testimony was. [¶] Already[,] I formed the opinion in my mind under the circumstances, and I'm prepared to hear argument, that alternate two at this point needs to be excused." The parties agreed with the trial court's conclusion and the court excused Alternate Juror No. 2.

The trial court continued: "The next issue to consider, where do we go from here. Both as to the three other additional jurors who are in the box as well as the entire jury panel; whether we need to voir dire them individually as to their capacity to continue to serve on this jury given that they've now observed the expert witness provide a critical service in the middle of trial."

The prosecutor thought an instruction telling the jury to disregard the events and any statements it may have heard during the course of treatment was sufficient. Defense counsel agreed and thought any "voir dire further draws attention to it. I think it's appropriate that the jurors be advised that the doctor has the training and an obligation to assist."

10

Once in the courtroom, the trial judge again summarized the events outside the presence of the jury: "Dr. Magana, in response to what appeared to be a critical medical emergency by alternate juror number two, went over to the jury box and provided critical care. And, of course, we're thankful that she did. I am going to have to inquire of the jurors whether they can move past that image in their minds and treat her testimony the same as anybody else. And, of course, we go to great lengths in jury trials to separate jurors from witnesses. And, again, we're thankful that Dr. Magana was here to provide care. We just want to make sure that there's no undue prejudice to the defendant as a result of the jurors witnessing that event."

When the jury entered, the court instructed as follows: "First of all, good news. Alternate juror two was able to leave the courtroom on her own power. And, of course, given the circumstances, we've excused her from any further service today. [¶] You never know what's going to happen in trial. And this is one of those occasions. Dr. Magana provided critical care to alternate juror number two. And we're happy she was here. We're happy she was able to do that. As you can tell from the instructions that I've already given you, we go to great lengths in this system to create separation between jurors, witnesses and attorneys. [¶] Obviously, we crashed through the fourth wall. I just want to make sure that all of you can separate having observed Dr. Magana treat alternate juror two, that you can separate that from your ability to critically analyze whatever testimony she's given in this case and is about to give. [¶] So can all of you promise me that you can do that? [¶] Everybody is indicating that they can do that."

Upon request of defense counsel, the trial court further instructed the jury: "Any statement made by alternate juror number two, and in fact this entire incident, should not be considered by the jury in evaluating this case when they begin deliberations."

11

B

*There Was No Error*

"Each criminal defendant is entitled to an impartial jury.  [Citation.]  That entitlement imposes upon each juror a duty to maintain impartiality throughout the trial.  [Citation.]  The loss of impartiality requires dismissal of the juror.  [Citation.]  Loss of impartiality may result from a juror's receipt of information about the case that was not part of the evidence received at trial.  [Citation.]  A jury must be 'capable and willing to decide the case solely on the evidence before it,' lest a due process violation occur."  (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 482-483.)

" 'The law is clear . . . that the court must investigate reports of juror misconduct to determine whether cause exists to replace an offending juror with a substitute.' "  (*People v. Mora and Rangel*, *supra*, 5 Cal.5th at p. 483.)  "However, ' "not every incident involving a juror's conduct requires or warrants further investigation.  'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court.' "  [Citation.]  " '[A] hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case.' " ' "  (*People v. Cowan* (2010) 50 Cal.4th 401, 506.)

Here, the information the trial court possessed was that jurors saw Dr. Magana render medical aid to Alternate Juror No. 2 and Alternate Juror No. 2 believed Dr. Magana's testimony to be persuasive.  In light of that knowledge, the trial court excused Alternate Juror No. 2 and asked the jury as a whole whether it could ignore the episode involving that juror and Dr. Magana and any statements made during the episode.  Each remaining juror indicated he, she, or they could remain impartial and fairly judge defendant's case.  There was nothing about the jurors' responses or demeanor that

12

indicated to the judge or the parties that additional inquiry was warranted or that the jurors would consider the episode when deliberating defendant's case.

"The state of mind of a juror is essentially a factual question. [Citation.] It ' "is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." ' [Citation.] '[A] trial judge who observes and speaks with a . . . juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record.' " (*People v. Revels* (2021) 71 Cal.App.5th 376, 385-386 (*Revels*).) The jurors indicated they could be fair, and we accept the trial court's credibility determination that the jurors were telling the truth.

Further, "where the conduct complained of occurs in the trial court's presence, we defer to the trial court's observations." (*Revels*, *supra*, 71 Cal.App.5th at p. 386.) Here, the incident complained of occurred in the trial court's presence where it could view the jurors' reactions to the situation at hand. It could further assess the severity of the situation and whether it reasonably would impact a juror's ability to be fair, or whether an admonition (as given here) would reasonably cure any prejudice. This is particularly true here, where the specifics of the situation are unknown and not clear from the record.

Comparing his case to our decision in *Revels*, *supra*, 71 Cal.App.5th 376, defendant argues his case presents more concern regarding juror partiality than in *Revels* and the trial court had a duty to sua sponte inquire of individual jurors and declare a mistrial. In *Revels*, a juror became unconscious during the testimony of a doctor expert witness. The doctor walked over to the juror, checked her pulse and said, " 'She doesn't have a pulse' " before speaking to the juror, who had apparently regained consciousness, by saying, " 'You passed out? I think she did. You okay?' " (*Id.* at p. 381.) The court excused the jurors from the courtroom. In all, the jurors saw the doctor go to the juror, take her pulse, talk to her, move her body, and sit her up. The jury also heard the judge tell someone to call 911. The juror ultimately regained consciousness and, outside the

view of the remaining jurors, left the courtroom by ambulance.  (*Ibid*.)  The jury was informed the juror was fine but had been released as a juror.  (*Id.* at p. 382.)  We held the trial court did not abuse its discretion by denying the defendant's request for a mistrial because its questioning of jurors individually after the incident, as well as the limited interaction seen by the other jurors between the ailing/excused juror and the doctor, demonstrated the jurors could be fair and impartial when evaluating the defendant's case. (*Id.* at p. 386.)

The problem with defendant's reliance on *Revels* is that the record here is unclear about what actually happened to Alternate Juror No. 2 and what type of medical aid was rendered, making comparison of the two cases difficult.  During the conference after the incident, the trial court observed that all the jurors witnessed Alternate Juror No. 2 say she was going to pass out and Dr. Magana begin to provide medical treatment.  Two jurors and another alternate juror saw Dr. Magana render further medical aid and heard Alternate Juror No. 2's statement that Dr. Magana was an effective witness.  What is missing from the record, however, is a recitation of what kind of aid Dr. Magana rendered and the medical issue experienced by Alternate Juror No. 2.  The trial court characterized the medical aid as "critical" but indicated Alternate Juror No. 2 was able to speak during her medical emergency and she left the courtroom under her own volition. There is also no indication Dr. Magana used a medical device or performed any life-saving measures; she simply fulfilled the expectation of all doctors to provide medical assistance to those in apparent need.  (*Revels*, *supra*, 71 Cal.App.5th at p. 386.)

Further, as we observed in *Revels*, this is not a case where the doctor rendering aid is a party in a medical malpractice action.  In the medical malpractice situation, the result may very well be different.  There, " '[t]he effect of this on the jury is immeasurable, whether or not individual jurors admit it or even consciously know it.' [Citation.]  We do not disagree with the conclusion of those [medical malpractice] cases that medical assistance furnished by a doctor, who is a party in a medical malpractice case, to a juror

14

in the presence of the jury compromises the integrity of the trial. However, [here] Dr. [Magana] was not a defendant in a civil malpractice case; [s]he was testifying as [an expert witness as to the extent and likely cause of the] injuries inflicted. Given h[er] role in this case, as opposed to that of a defendant doctor in a medical malpractice case, [rendering aid to an ailing juror] does not implicate the same concerns of inevitable bias noted in [medical malpractice] cases." (*Revels*, *supra*, 71 Cal.App.5th at pp. 384-385.)

The fact the trial court did not place the jurors under oath and individually question each juror about whether each could be fair is not determinative of the issue, and defendant does not cite to any authority requiring such an inquiry. The trial court is required to hold an inquiry that is reasonably necessary to determine whether a juror should be discharged. (*People v. Cowan*, *supra*, 50 Cal.4th at pp. 505-506.) Here, the trial court and parties, all of whom were witnesses to Dr. Magana rendering medical aid to Alternate Juror No. 2, believed a general inquiry and curative instruction was sufficient to prevent the remaining jurors from improperly considering Dr. Magana's conduct when assessing defendant's case. Given the circumstances of the medical emergency revealed in the record and the assurances given by jurors that they could be impartial, we defer to the trial court's judgment the jurors were not biased by seeing Dr. Magana render medical aid and further investigation was unwarranted.

Defendant further argues the trial court should have sua sponte declared a mistrial given the unavoidable prejudice resulting from Dr. Magana's rendering of medical aid. We disagree. As described, this is not a case where the extraneous material revealed to the jury was so prejudicial that it was inherently likely to have influenced a juror. Further, the trial court's inquiry was sufficient to assure that no juror was actually biased, except for Alternate Juror No. 2, who was excused. (See *People v. Nesler* (1997) 16 Cal.4th 561, 578-579 [juror "bias may appear in either of two ways: (1) if the extraneous material, judged objectively, is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror; or (2) even if the

15

information is not 'inherently' prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was 'actually biased' against the defendant"].) Accordingly, the trial court was not required to sua sponte declare a mistrial.

III

*Defendant Is Entitled To Remand For Resentencing*

Defendant contends he is entitled to resentencing under the retroactive application of Senate Bill No. 567 (2021-2022 Reg. Sess.) and Assembly Bills Nos. 124 (2021-2022 Reg. Sess.) and 518 (2021-2022 Reg. Sess.). The People concede remand for resentencing is required under the amendments enacted by Assembly Bill No. 518 to section 654. The People further concede that, because we must remand for resentencing on this ground, the trial court can apply the amendments enacted by Senate Bill No. 567 and Assembly Bill No. 124 to section 1170 when resentencing defendant. We accept the People's concessions.

Assembly Bill No. 518 amended section 654, subdivision (a) to provide, in pertinent part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (Stats. 2021, ch. 441, § 1, eff. Jan. 1, 2022.) Previously, "the sentencing court was required to impose the sentence that 'provides for the longest potential term of imprisonment' and stay execution of the other term. [Citation.] . . . [S]ection 654 now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.) Further, Assembly Bill No. 518 "applies retroactively to defendants . . . whose convictions were not yet final when the law became effective January 1, 2022." (*People v. Sek* (2022) 74 Cal.App.5th 657, 673.)

Here, defendant was sentenced before the effective date of Assembly Bill No. 518 and the trial court sentenced defendant to the longest term of imprisonment available while staying lesser-term sentences under former section 654. Accordingly, remand is necessary for the trial court to exercise its discretion under the current version of section 654 and to choose which sentence to impose. As we remand for resentencing under Assembly Bill No. 518, the trial court may reconsider all of its prior sentencing decisions as to all counts under the statutes now in effect, including both section 1170 and the current version of section 654. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893.)

## DISPOSITION

The judgment of conviction is affirmed. Defendant's sentence is vacated and the matter remanded for resentencing in light of newly-amended sections 654 and 1170. After resentencing, the superior court clerk is directed to prepare and forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.

/s/
Robie, Acting P. J.

We concur:

/s/
Renner, J.

/s/
Earl, J.